**Paul E. TAYLOR, Jr., individually and as next friend of Timothy P. Taylor and Gladys F. Taylor, Plaintiffs,**

v.

**WILMINGTON MEDICAL CENTER, INCORPORATED, a hospital corporation of the State of Delaware, and J. Rafael Yanez, M.D., Defendants.**

**Civ. A. No. 81–147–WKS.**

United States District Court, D. Delaware.

Nov. 16, 1983.

C. Waggaman Berl, Jr., Howard M. Berg, Marie C. Bifferato, Howard M. Berg & Associates, Wilmington, Del., for plaintiffs.

Robert J. Katzenstein, Richards, Layton & Finger, Wilmington, Del., for defendant Wilmington Medical Center.

William D. Bailey, Jr., Phebe S. Young, Bayard, Brill & Handelman, Wilmington, Del., for defendant Yanez.

## OPINION

STAPLETON, Chief Judge:

This medical malpractice action was brought by Paul E. Taylor, as next friend of his minor son, Timothy P. Taylor, alleging malpractice in the medical treatment afforded Timothy by J. Raphael Yanez, M.D., among others. Doctor Yanez has moved for summary judgment on all claims.

This Court reads the specific allegations of malpractice to be as follows:

1. Failure to properly diagnose Timothy's condition as lipomyelomeningocele.

2. Failure to advise his parents that Timothy was suffering from spina bifida, so that they did not avail themselves of one of the clinics specializing in spina bifida disorders.

3. Improper delay in surgically correcting Timothy's condition.

4. Delay in the diagnosis of progressive neurological deficits that indicated the need for surgical intervention.

5. Failure to obtain orthopedic or urological consultations.

6. Failure to refer Timothy to an appropriate specialist or specialized institution for treatment of his condition.

7. Failure to obtain neurological evaluations, in particular, a myelogram, before discharge from the hospital.

8. Failure to advise Timothy's parents that alternative courses of treatment were available.

9. Advising Timothy's parents that removal of the lipoma would cause paralysis. As a result, they allegedly failed to consult a neurosurgeon who favored early prophylactic surgery in time to prevent neurological damage.

The medical expert opinion offered by Dr. Yanez has satisfied this Court that there are no material issues of fact with regard to claims 1 through 7. Because the professional care given Timothy with regard to these claims was in accordance with the standards of care employed by neurosurgeons in the Wilmington community, summary judgment is granted. As to claims 8 and 9, material issues of fact remain and summary judgment is therefore denied.

## FACTS

Timothy was born on June 4, 1976, at the Wilmington Medical Center, Wilmington General Division. At birth, an obvious, orange-sized lump was noted at the base of his spine, and X-rays revealed an opening in the spine. The child's pediatrician ordered a neurosurgical consultation and arrangements were made for Dr. Yanez, a staff neurosurgeon, to see Timothy for purposes of diagnosis and treatment. Dr. Yanez examined Timothy on June 5, 1976. No neurological abnormalities or hydrocephalus were noted and since the mass was skin covered, Dr. Yanez found no indica-

tions for emergency surgery. The noninvasive diagnostic procedures undertaken did not yield a definitive diagnosis, so Timothy was discharged, to be readmitted in approximately three months for diagnostic and possibly corrective surgery. At no time did Dr. Yanez order a myelogram to diagnose the nature of the spinal involvement or an intravenous pyelogram (IVP) to evaluate kidney function; nor did he obtain any neurological, orthopedic, or urological consultations.

Timothy was seen again on June 11, at Dr. Yanez's office; the initial observations were confirmed. Dr. Yanez explained to the parents that he did not know whether surgical removal could be accomplished without compromising either the spinal cord or nerves, if any were found to emerge into the fatty tumor. He proposed surgery to determine the exact nature of the condition, and to correct it, if possible. A discussion of the risks of surgery centered on the possibility of paralysis, with the parents expressing great concern that their child not be paralyzed.

Dr. Yanez performed surgery on September 17, 1976. The operative report reveals that Dr. Yanez found a large fatty mass that extended through a hole in the spine which was two inches in diameter and wrapped around the nerves of cauda equina at the lower end of the spinal cord. Further dissection revealed "a multitude of nerves intertwined in this mass of lipomatous tissue." A small piece of fatty tissue was removed for biopsy, and a spinal fluid leak was repaired, but no attempt was made to correct the defect. The operative report reflects a post-operative diagnosis of "sacral intra-and extradural lipoma." The discharge diagnosis was "cauda equina lipoma with extra dural extension." The infant suffered no ill effects from the surgery, and the post-operative neurological examination was unchanged.

Dr. Yanez informed the parents that he had not corrected the lesion, that the child might develop normally, but that, on the other hand, problems might appear as the child developed. He advised that Timothy be observed closely and periodically reexamined by him. There is a dispute as to precisely what, if anything, the parents were told as to the alternatives to the course advised by Dr. Yanez. It is also disputed as to whether Dr. Yanez informed Timothy's parents after the surgery that surgical removal of the lipoma would cause paralysis, or that it would pose an *unacceptable risk* of paralysis at that time.

Dr. Yanez saw Timothy again on January 17, 1977. His office notes and follow-up letter to the child's pediatrician reveal that Dr. Yanez considered the infant's development to be within normal limits. His parents were aware of no problems. He was standing in his crib and taking a few steps. His mother reported no dribbling of urine or soiling. Pressure on the suprapubic region initially produced no urine, but heavy pressure for some seconds did cause drops of urine to come out. At this time, Dr. Yanez learned that Timothy had been referred by his pediatrician to the A.I. DuPont Institute for a mild abnormality of the left foot.

On September 16, 1977, Dr. Yanez again saw Timothy. The child was walking and running. Dr. Yanez found no evidence of "dribbling" or any other signs of neurological impairment.

Dr. Yanez saw Timothy again on May 1, 1978. His own observations and reports from Timothy's parents indicated no abnormality. Reports received by Dr. Yanez from the DuPont Institute indicated that treatment of the foot condition was progressing very well. Suprapubic pressure did not produce a urine leak; anal sphincter tone was normal.

At his examination of Timothy on September 17, 1979, Dr. Yanez first noted signs of progressive neurological damage. Suprapubic pressure produced dribbling of urine and soiling of his pants. His parents also reported a tendency to fall.

At this point it was apparent to Dr. Yanez that neurological deterioration was occurring and he arranged a referral to Dr. Leonard Malis, Professor and Chairman of the Department of Neurosurgery at Mount

Sinai Medical Center in New York. It was Dr. Malis' opinion in October of 1979 that surgery still did not represent an acceptable risk.

In November of 1979 the Taylors were referred, either by Dr. Yanez or Dr. Malis, to Dr. Luis Schut of Children's Hospital of Philadelphia. Dr. Schut successfully removed the lipoma in January of 1980.

### Competency of Expert Medical Witnesses to Testify As to the Wilmington Standard of Skill and Care

Delaware has enacted a comprehensive statutory scheme governing malpractice actions, The Delaware Health Care Malpractice Insurance and Litigation Act, 18 Del.C. § 6801, *et seq.*, effective April 26, 1976. Section 6854 of that Act sets forth the test of competency for expert medical witnesses:

No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in the State.

■ The Supreme Court of Delaware, in *Loftus v. Hayden*, 391 A.2d 749, 752 (1978), considered the meaning of the statutory term "familiar" and the factors that may be considered in determining whether a proposed expert medical witness has gained the requisite familiarity with Delaware medical practice: "[A] witness offered to give 'expert medical testimony' should establish that he 'knows' what degree of skill is ordinarily employed here and that he is well acquainted or thoroughly conversant with it." The court went on to state that the proposed witness "must present facts" from which the court can make the necessary determination. While a potential medical witness can demonstrate the necessary familiarity in a variety of ways, in each case the court must make

a factual determination, considering and balancing all the relevant factors.

The following factors are among those that the court may consider in determining the competency of an expert medical witness to testify to the applicable standard of care: 1) direct observation in Delaware; 2) study in Delaware (as a medical student on rotation, as an intern or resident); 3) care of Delaware patients referred by Delaware physicians; 4) teaching of students who have dispersed to Delaware; 5) reading of Delaware medical records, reports, journals, etc; 6) consultations with Delaware physicians; and 7) attendance at meeting with Delaware doctors. *Id.* at 753.

■ Given these standards, it is quite clear that the affidavit of M. Kathryn Hammock, M.D., tendered by plaintiffs, is inadmissible. The record is totally devoid of facts from which the Court could conclude that Dr. Hammock possesses any familiarity with the applicable Delaware standard of care.

■ It is equally clear that the affidavit of Martin Gibbs, M.D. is admissible under Section 6854 as expert medical testimony regarding the standard of care ordinarily employed by neurosurgeons in the Wilmington, Delaware medical community during the relevant period, June, 1976 through 1979. Dr. Gibbs has been actively engaged in the practice of neurosurgery in Wilmington since 1964, and was Chief of Neurosurgery at the Wilmington Medical Center from March, 1977 to 1978.

■ This Court is also convinced that under *Loftus*, Dr. Luis Schut is competent to testify as to the standard of care prevailing among Wilmington neurosurgeons during the years 1976–1979, with regard to the treatment of lipomyelomeningocele. On the other hand, while the facts establish Dr. Schut's familiarity with the major therapeutic standards of care among Wilmington neurosurgeons, the record is insufficient to establish the requisite degree of familiarity with the details of neurosurgical practice, such as the counseling of patients.

Dr. Schut is a Professor of Neurosurgery and Professor of Pediatrics at the University of Pennsylvania. Since 1969 he has served as Chief of Neurosurgical Services at the Children's Hospital of Philadelphia. It was Dr. Schut who undertook the care of Timothy Taylor in November, 1979, and who ultimately performed surgery to remove the lipoma in January of 1980. Although Dr. Schut was not practicing medicine in Wilmington during the relevant period, he served an internship at Wilmington General (1955–56) and was Chief of Neurosurgery at the Veterans' Administration Hospital in Wilmington in the early 1960's. More important, Dr. Schut's deposition reflects his active role as an educator and general advocate of his medical views. He was actively involved in a number of professional neurosurgical associations and was a frequent participant at neurosurgical conferences around the world, regularly presenting papers at these meetings. From these activities, Dr. Schut is personally familiar with various Wilmington neurosurgeons, including Dr. Gibbs. In his deposition testimony, [Schut, I, pp. 7–8] he stated that Dr. Gibbs "comes and visits with us, and as a matter of fact recently attended one of my lectures in Chicago where I was talking about spinal dyserphisms."

I am convinced from Dr. Schut's deposition testimony that his active participation in formal and informal educational activities with his neurosurgical colleagues gave him an unusual knowledge of prevailing standards of care in the Wilmington area. As a strong advocate of a distinctly minority view regarding the treatment of lipomyelomeningocele, Dr. Schut frequently discussed these matters with his fellow neurosurgeons. In response to a question about whether he was familiar with the practice of neurosurgeons in the Southeastern Pennsylvania area, Dr. Schut answered, "Yes, and nationally and internationally, too, if you want to amplify that. It's my job." [Schut I, p. 34]

### 1) *Error in Diagnosis*

■ The allegations that Dr. Yanez failed to properly diagnose Timothy's condition as a lipomyelomeningocele appear to stem from the varied terminology that he used in hospital and office records, correspondence, etc., and his failure to use the term "lipomyelomeningocele." Prior to the September, 1976 surgery, Dr. Yanez had listed several possible conditions consistent with the physical findings, but did not make any definitive diagnosis; surgery was intended in part for diagnostic purposes. The deposition testimony of Mr. Taylor [pp. 18–19] indicates that the Taylors were fully aware that Dr. Yanez "was not sure what he was going to find." A post-operative diagnosis of "sacral intra- and extradural lipoma" is listed on the Operative Report; the discharge diagnosis was "cauda equina lipoma with extradural extension." In his follow-up letter to the child's pediatrician, Dr. Yanez used the following anatomical description to explain his findings: "spina bifida with a intradural lipoma wraping [sic] around the nerves of the cauda equina extending through the spina bifida defect into the subcutaneous tissue of the presacral area forming the clinical visable bulging." No expert medical testimony has been presented to suggest that these ways of describing the condition were in any way incorrect or misleading to other physicians. On the contrary, Dr. Gibbs' Reply Affidavit (C–15) indicates that there was no standard nomenclature with regard to these lesions during the period at issue. He cites the varied terminology appearing in the literature, and the absence of the term "lipomyelomeningocele" from 1965, 1968, 1977 and 1978 editions of the standard texts dealing with the nomenclature of disease. Dr. Gibbs stated that in the absence of standard nomenclature for this condition, an anatomical description of the type employed by Dr. Yanez is within the appropriate standard of care in communication with both patients and other physicians. There is no competent, contrary testimony.

### 2) *Failure to Use the Term "Spina Bifida"*

A very closely related claim is that Dr. Yanez failed to use the term "spina bifida"

in describing Timothy's condition to his parents. Spina bifida refers to a congenital condition in which the posterior portions of one or more vertebrae fail to completely close to form the normal ring shape. [Gibbs' Affidavit, at A 3] Spina bifida, i.e., an open vertebra, is actually fairly common, occurring in six to eight percent of the general population. In most cases, the spinal cord and meninges are entirely normal and the area is covered by normal skin so that the condition is never even diagnosed unless X-rays of the region happen to be taken for some other reason. When other pathology is present it can take many forms, one of which is the fatty tumor seen in Timothy Taylor. By itself, the term "spina bifida" does not provide sufficient information to define the nature of the abnormality involved, nor to indicate the course of treatment that should be followed.

Dr. Gibbs' affidavit [at A 11] indicates that the standard of care among Wilmington neurosurgeons in 1976 and today calls for a child's condition to be described to his parents "in the simplest terms commensurate with an adequate conveying of information." In particular, Dr. Gibbs stated that the standard of care does not require use of the terms "spina bifida" or "lipomyelomeningocele." Instead, it should be explained that the condition involves an opening in the bony portion of the spine, a fatty mass, a possible involvement of nerves, and the possibility that the fatty mass may extend into the spinal canal. Similarly, Dr. Schut testified [Schut I, p. 13–14] that he generally avoids technical terminology such as "spina bifida" in favor of simple descriptions when discussing a child's condition with his parents.

While Dr. Yanez did not use the term "spina bifida," he did undertake to explain, through diagrams, books, and simple terminology, the nature of Timothy's condition. Mr. Taylor testified that he understood that the condition could involve a hole in the spine and that nerves might emerge into this fatty lump. Consequently, there is no material dispute of fact that Dr. Yanez's explanations of Timothy's condition were within the applicable standard of care, and that he was not required to use the terms "spina bifida" or "lipomyelomeningocele."

### 3) *Improper delay in surgically correcting Timothy's condition*

There is no material dispute of the fact that during the years 1976–79, there were two distinct schools of thought regarding the advisability of surgical intervention in cases of lipomyelomeningocele without progressive neurological deficits. Drs. Gibbs, Yanez, and Schut have testified that the standard of care among neurosurgeons in Wilmington dictated *non* intervention where the fatty tissue infiltrated the spinal cord and spinal nerves or where nerves passed out into the fatty tumor. It was felt that in some cases the child would develop normally or at least without any further deterioration. Since surgery and manipulation of the spinal cord and severing of emerging nerves are extremely hazardous and may even cause paralysis, it was felt that the risks of surgery outweighed the benefits in the absence of neurological deterioration. Instead of immediate surgery, Wilmington neurosurgeons felt that the child should be observed for the appearance of problems indicating that progressive nerve damage was taking place. At that point, a reevaluation of the potential risks and benefits of surgery might yield a different result. This was the view held by the great majority of neurosurgeons during the years 1976–79, not only in Wilmington, but around the world. As Dr. Schut testified, 99.9% of neurosurgeons did not believe that surgery was indicated until there was evidence of progressive nerve damage.

On the other hand, a small minority of neurosurgeons, including Dr. Schut, advocated surgical resection of lipomyelomeningoceles within weeks of birth. They felt that neurological damage was the almost invariable result of the "tethering" or anchoring of the spinal cord caused by the lipoma. In the normal infant the spinal cord is attached to the base of the brain

but otherwise floats free within the spinal column. As the child grows, the spinal column grows and lengthens faster than the spinal cord. If the cord is affixed to the spinal column at some point by a lipoma, it cannot float upward as the spinal column grows. Instead, it is stretched and damaged. In some cases, a lipoma may also produce compression of the nervous tissue.

While a few neurosurgeons, including Dr. Schut, have long believed in early surgical intervention to free the spinal cord, this was a distinct minority view during the years 1976–79. While subsequent studies have presented hard data supporting this view and the standard of care has now changed, during the period in question Wilmington neurosurgeons adhered to the conservative approach to surgery. Drs. Gibbs, Schut, and Yanez have all testified that this was the standard of care among Wilmington neurosurgeons and there is no competent medical evidence to the contrary. There can be no liability for providing health care in conformity with community standards. 18 Del.C. § 6801(7). Furthermore, as a matter of Delaware law, if two techniques or methods of treatment are accepted within the relevant medical community, it is not negligent to choose one over another. *DiFilippo v. Preston*, 53 Del. 539, 173 A.2d 333, 337 (Del.S.Ct.1961).

I realize that plaintiffs also allege that Dr. Yanez actually chose early surgical intervention but was unable to properly perform the surgery he had undertaken. They cite Dr. Yanez's September, 1976 surgery on Timothy for this proposition. The record fails to support this allegation. The uncontradicted evidence indicates that Dr. Yanez decided to perform surgery in large part for its diagnostic value. He intended to remove the lipoma if and only if it was not infiltrated by nerves and did not impinge upon the spinal cord and nerves. This is entirely consistent with the prevailing view in the medical community. (Gibbs, Affidavit I, pp. A 12–13). No medical evidence has been presented to suggest that removal of an orange-sized lump from a baby's back would have been inconsistent with accepted standards of care if it could have been done without risking nerve damage. Moreover, no harm resulted from the 1976 surgery.

4) *Delay in diagnosing progressive neurological damage indicating the need for surgery*

Plaintiffs further allege that even if the initial decision to delay surgical removal of the lipoma was not negligent, Dr. Yanez failed to diagnose progressive neurological damage when it appeared. Thus, plaintiffs allege that Dr. Yanez was negligent even under the conservative approach to surgery that he espoused. Plaintiffs point out that Timothy began exhibiting orthopedic deformities during his first year of life, for which he was treated at the A.I. DuPont Institute. Plaintiffs also point to the "dribbling" of urine that Dr. Yanez found on January 17, 1977, during one of his routine periodic examinations of Timothy.

However, the affidavit testimony of Dr. Gibbs flatly contradicts the assertion that these findings constituted evidence of a progressive neurological deficit. After reviewing the office records of Dr. Yanez, Dr. Gibbs concluded that the findings of varus foot and the single incident of dribbling of urine, seen in January, 1977, and not duplicated on subsequent testing until September, 1979, reflected at most a stable neurological deficit, not warranting surgical intervention under the then-prevailing standard of care. No competent expert medical testimony has been offered to the contrary.

5) *Failure to Obtain Orthopedic or Urologic Consultations*

Dr. Gibbs testified that the applicable standard of care called for orthopedic and urological consultations only when neurological changes became apparent. In fact, Timothy was referred by his pediatrician to the A.I. DuPont Institute for treatment of an orthopedic problem that developed before he was a year old. Dr. Yanez was aware that Timothy was being cared for at

the DuPont Institute and he received at least some of the records of the child's visits. Moreover, there is no evidence that Timothy lacked proper orthopedic care, that he suffered any harm from lack of expert orthopedic care, or that he would have benefited from additional orthopedic care.

It is apparent from the record that Dr. Yanez followed Timothy's urologic function closely while the child was under his care. Plaintiffs' complaint appears to center on the fact that at no time did Dr. Yanez order an intravenous pyelogram (IVP) to evaluate Timothy's kidney function or determine the presence of other urinary tract abnormalities. However, Dr. Gibbs' testimony is that under the applicable standard of care, an IVP was not mandatory before the appearance of neurological changes. In addition, when Dr. Schut obtained an IVP prior to the January, 1980 surgery, the results were normal. Clearly then, no injury resulted from any failure to order an IVP at an earlier time. Consequently, plaintiffs have established no material issue of fact concerning these claims.

### 6) *Failure to refer Timothy to an appropriate specialist or specialized institution*

Dr. Gibbs testified that the standard of care among Wilmington neurosurgeons in 1976 did not call for referral of a patient such as Timothy to a specialist or specialized institution such as the Children's Hospital of Philadelphia. He stated further that a referral to the A.I. DuPont Institute for a neurosurgical evaluation would have resulted in the patient being seen by Dr. Gibbs, as he was the Attending Neurosurgeon. Dr. Gibbs would have advised the same treatment as Dr. Yanez. As plaintiffs have not presented any competent medical testimony to refute that offered by the defendant, summary judgment as to this claim is granted.

### 7) *Failure to Obtain Neurological Evaluations*

Like the allegations dealing with the failure to obtain orthopedic and neurological evaluations, this claim appears to be based primarily on the failure of Dr. Yanez to obtain a myelogram. There is no dispute in the record that Dr. Yanez regularly reviewed Timothy's neurological function by evaluating sensation, muscle control, etc.

A myelogram is an X-ray procedure in which a radio-opaque dye is injected into the spinal canal so that any defects or abnormalities may be visualized. It is a hazardous procedure that must be performed under general anesthesia, and Dr. Gibbs has testified that in 1976 no Delaware neurosurgeons were doing myelograms on infants with lipomyelomeningoceles. Surgical exploration, as done by Dr. Yanez, serves the same diagnostic function and has the advantage that the mass can be removed at the same time if indicated in light of the findings. Dr. Gibbs' testimony indicates that Dr. Yanez was within the Delaware standard of care in not obtaining a myelogram and plaintiffs have presented no competent expert testimony to the contrary.

### 8) *Failure to Inform Timothy's Parents of the Alternative Courses of Treatment Open to Them*

It is apparent from Dr. Yanez's office notes and the deposition testimony of Timothy's parents that the child's condition was explained and the nature and risks of the proposed surgery were discussed. Dr. Yanez advised the parents that surgery could result in paralysis if the lipoma invaded the spinal cord or if the lipoma was traversed by nerves. The parents informed Dr. Yanez that he should avoid doing anything that would cause paralysis. After the surgery, Dr. Yanez told the parents that Timothy might develop problems as he grew older and that he should be observed and brought back for periodic examination and reevaluation.

Plaintiffs allege that they were not adequately informed of the alternatives open to them. Here, the alternatives were immediate surgery, delayed surgery, or no surgery, and it is apparent from the record

that plaintiffs were at least superficially aware of these alternatives. Plaintiffs assert that Dr. Yanez had a duty to advise them that some physicians were advocating immediate surgery to avoid damage resulting from a "tethered cord." There is testimony of Dr. Gibbs that *referral* to a neurosurgeon who favored early surgery was not required in the Wilmington neurosurgical community, but there is no expert testimony in the record to the effect that the explanation of the alternatives by Dr. Yanez satisfied community standards. Since Dr. Yanez has failed to provide competent evidence which, if credited, would entitle him to judgment on this claim, the present motion must be denied with respect to it.

### 9) *Advising Timothy's Parents that an Attempt to Surgically Correct His Condition Would Cause Paralysis*

■ Plaintiffs claim that after the exploratory surgery, Dr. Yanez informed them that he had been unable to remove the mass since removal would have resulted in paralysis. As a result of this affirmative false representation, they allege that they failed to consult a neurosurgeon who favored early prophylactic surgery and that if they had consulted such a surgeon, Timothy would have been operated on in time to prevent neurological damage. In response, Dr. Yanez states that he informed plaintiffs only that he considered surgery to be unwarranted at that time in light of the great risk of paralysis. He emphasizes that his benefit-risk analysis was influenced by the statement of Timothy's parents that he do nothing to cause paralysis.

While Dr. Yanez's office notes support his version of what he told Timothy's parents, the parents' sworn testimony creates a material factual dispute on this issue that

may not be resolved on a motion for summary judgment.*

The Court understands the issues remaining in the case against Dr. Yanez to be as follows:

1. Whether Dr. Yanez adequately informed Timothy's parents of the alternative courses open to them. This includes the issue of whether, under the applicable standard of care, Dr. Yanez was required to advise plaintiffs that some neurosurgeons advocated immediate surgery even in the absence of neurological deterioration.

2. Whether Dr. Yanez told Timothy's parents that surgical removal of the lipoma would cause paralysis, or whether he told them only that such surgery presented an unacceptable risk of paralysis at that time.

As to all other claims asserted by the plaintiffs, summary judgment in favor of Dr. Yanez will be granted.

---

* At oral argument Dr. Yanez argued that summary judgment is appropriate because plaintiffs are unable to show a causal nexus between the delay in the removal of the lipoma and the neurological damage which Timothy suffered. This argument is based upon deposition testimony of Dr. Schut that he could not say whether earlier removal would have prevented that damage. While I agree that plaintiffs will have to prove such a nexus at trial, the absence of such a nexus was not a basis for Dr. Yanez's motion for summary judgment and plaintiffs did not have a fair opportunity to proffer evidence on the point.