Kenza **TYLER**, a minor child, Donna Allen Tyler, as guardian ad litem for Kenza Tyler Plaintiffs,

v.

**ALBERT DWORKIN, M.D., P.A.**, a Delaware professional association, Albert Dworkin, M.D., individually, and Mohammad Imran, M.D., Defendants.

Civil Action No. 94C–01–054–JOH.

Superior Court of Delaware, New Castle County.

Submitted: Jan. 15, 1999. Decided: March 15, 1999.

---

Charles Snyderman, of Charles Snyderman, P.A., Wilmington, attorney for plaintiffs.

John D. Balaguer, of White and Williams, LLP, Wilmington, attorney for defendants Albert Dworkin, M.D., and Albert Dworkin, M.D., P.A.

Anne L. Nazci, of Tybout, Redfearn & Pell, Wilmington, attorney for defendant Mohammad Imran, M.D.

## *OPINION*

HERLIHY, Judge.

Plaintiff Donna Allen,[1] guardian *ad litem* for Kenza Tyler, has moved for a new trial. On November 22, 1998, a jury found in favor of defendants Albert Dworkin, M.D., and Mohammad Imran, M.D. The jury determined that neither defendant committed medical negligence.

Allen raises several grounds in support of her motion. She argues that (1) the

1. Donna Allen has married since filing this suit, but for clarity, the Court will use her name in which this lawsuit was filed.

jury's verdict, as to Dr. Dworkin, is against the great weight of the evidence, (2) the defendants prejudicially and repeatedly mentioned a form Allen signed saying she left the hospital against medical advice, (3) the defendants intimidated Allen's bridging expert, (4) the Court did not use a number of her proposed *voir dire* questions, (5) she was precluded from arguing that failure to take complete records resulted in medical negligence and (6) the Court erred in its definition of medical negligence given to the jury.

The Court concludes the jury's verdict was not against the great weight of the evidence and that none of the other grounds Allen raises warrant the granting of a new trial.

### FACTUAL BACKGROUND

Allen was pregnant with Kenza Tyler during 1992. Her primary obstetrician was defendant Dr. Dworkin. She testified that while pregnant, her regular appointments were with him. In June 1992, some discomfort prompted a brief visit to the hospital.

On August 2, 1992, Allen felt very uncomfortable. She telephoned Dr. Dworkin's office and learned Dr. Imran was on call. He returned her telephone call and they discussed her condition, including the fact that she was near term with Kenza. Dr. Imran directed her to go to Christian Hospital and Allen testified that he said he would meet her there. Dr. Imran denied saying this to her.

Allen arrived at the hospital shortly before midnight on August 9, 1992. Soon after her arrival, she was hooked up to a fetal monitor to monitor the fetal heart rate. The general purpose of monitoring is to determine fetal well-being. The fetal heart rate is monitored for variables in heart rate, particularly accelerations and decelerations in relation to maternal contractions. Within certain limits, accelerations and decelerations are considered reassuring. Certain accelerations and/or decelerations at particular times can be non-reassuring and are signs of fetal problems. Those problems involve possible dangerously low fetal oxygen levels which can be due to bleeding or other conditions such as cord compression.

The monitoring system to which Allen was connected produces tracing strips. Several of these strips were taken while Allen was in the hospital August 9–10. It would appear that as time went along, the indications on the strips began to suggest some problems. Decelerations were noted and their relationship to contractions became less clear. Because the variations became problematical, the hospital staff wanted Allen to remain for further testing.

Allen testified that she told the hospital staff that Dr. Imran said he would meet her at the hospital. She also said the hospital staff told her several times, he was on the way. Allen said she told the staff she had an appointment with Dr. Dworkin at 9:00 a.m. on August 10th. Eventually, her contractions stopped and she testified that the hospital staff told her that she and her baby were fine and that she could leave. She left sometime after 3:00 a.m. on the 10th. Dr. Imran had not arrived at the hospital by the time Allen left.

Christiana Hospital records contradict Allen's testimony about the circumstances of her departure. They show that before she left, she signed a document entitled Departure Against Physician's Advice [hereafter AMA document]. Allen acknowledges her signature but has no recollection of it or of any of the circumstances surrounding her signature on it. Prior to trial, Allen had objected to the introduction of the AMA document or any reference that she had left the hospital against medical advice.

Over Allen's objections, the Court had ruled that the AMA document was admissible but ordered two parts be redacted. One section, Part B, was an agreement by Allen to hold harmless the Medical Center of Delaware and the other was the hand-

written statement "Death to infant & Patient" which followed the typewritten words, "Possible consequences of non-treatment include." During the trial, the defendants frequently mentioned the AMA document and Allen's departure against medical advice. When Dr. Imran was testifying, his counsel moved to introduce it, referring to it as "redacted." The Court gave a cautionary instruction before admitting it (over Allen's objection).

Allen kept her 9:00 a.m. August 10th appointment with Dr. Dworkin. She testified she had no reason to believe she or her fetus were in danger. She recalls Dr. Dworkin saying he understood she had been at Christiana Hospital. Dr. Dworkin knew this because Dr. Imran had called him early in the morning on August 10th. He told Dr. Dworkin that Allen had been in the hospital and, believing she was in labor, was put on a fetal monitor but that she had left against medical advice. Dr. Dworkin recalls Dr. Imran telling him there were decelerations on the monitor strip but he does not recall Dr. Imran saying the test was non-reassuring.

The office nurse's note from her conversation with Allen before seeing Dr. Dworkin mentions the hospital visit and that Allen's cervix was closed. When Dr. Dworkin saw Allen, he examined her for any swelling in her hands or ankles, measured her uterus, checked her urine and used a stethoscope to listen to the fetal heartbeat. He did not hook up a fetal monitor. Dr. Dworkin detected no fetal heart rate decelerations and concluded all was fine with Allen and the fetus.

Based on Dr. Imran's telephone call to him, however, he thought a follow-up test was needed. He told Allen to return to his office on August 11th for a biophysical profile test. Dr. Dworkin explained that such a test gives more information about fetal status than does the fetal heart monitor test. There are four measurements, or parts, involved with this test which he used on August 11th. The test looks at fetal tone, breathing and movement and tests amniotic fluid. Each of the four parts gets a maximum of two points. Allen scored eight out of eight, which is the maximum and best score.

With that score, Dr. Dworkin decided to do no further testing that day. He testified that Delaware perinatologists do not do non-stress testing with an eight-out-of-eight score on the biophysical profile test. Further, as a general rule, such a score means the fetus is fine. Dr. Dworkin said that if a fetus were compensating for lack of oxygen, there would not be an eight-out-of-eight score. Still, to be safe, however, he ordered a fetal monitoring test on August 14th.

Allen returned for that test on the 14th. There were some initial difficulties in getting readings. Once those problems were corrected, Dr. Dworkin saw repetitive and recurring decelerations which were non-reassuring. He wanted follow-up monitoring at the hospital and sent Allen immediately to Christiana Hospital. He testified that none of the problems he saw on the 14th were present during the testing on the 11th. Allen testified she drove herself to the hospital. She recalls some testing and someone saying the fetus had to be taken out right away. An emergency caesarian section was performed.

Dr. Richard Fischer, a pediatric neurologist saw Kenza for the first time on August 14, 1992, approximately six hours after she was born. Based on his examination of the records, Kenza's condition, and other information, he opined that fetal to maternal bleeding had caused a severe blood loss in Kenza. Dr. Fischer told the jury that Kenza had been bleeding over a period of time, about a week, but that it was small and intermittent. This did not cause damage but did create some fetal stress. That stress was detectible, he said, in the heart rate decelerations noted on August 9–10. Eventually, however, something catastrophic occurred shortly before her birth causing Kenza to almost exsanguinate.

The loss of blood meant a severe loss of oxygen, which, of course, caused severe, permanent brain damage. Based on his examination of Kenza on August 16th and other examinations and records, Dr. Fischer said the "insult" to Kenza's brain was around 12 hours before birth or on August 13th or the 14th. If she had been born on the 11th or 12th, he testified, Kenza would have been neurologically intact. As a result of the brain damage, Kenza is profoundly retarded, has cerebral palsy and is quadriplegic.

Dr. Fischer and others provided far more details about Kenza's treatment from birth on, her immense particular needs for physical, speech and other therapies, special education and care at home and in special schools and special equipment. It was also quite clear that Kenza's entire family participates in the many facets of the very special, intense and complicated care Kenza requires, particularly in feeding since swallowing is particularly difficult and dangerous. That danger could easily lead to aspiration pneumonia.

Dr. Stuart Edelberg, an obstetrician/gynecologist from Baltimore testified for Allen as a standard of care witness. Dr. Edelberg was not Allen's original standard of care expert; it was to have been Dr. Mark L. Chaiken, a doctor in Baltimore. On October 5, 1998, the Court received a letter from Allen's counsel indicating that Dr. Chaiken had to withdraw as her expert witness. Counsel was unable to offer a reason. All counsel consented to the Court corresponding directly with Dr. Chaiken's counsel and to an *ex parte* review of any response. The Court received a response from Dr. Chaiken's attorney dated October 22nd. The *ex parte* review was conducted, and the letter has been placed under seal for any potential appellate review. At the pretrial conference on October 27th, the Court indicated that it was satisfied with the reason for the withdrawal. The Court had previously advised counsel to proceed to obtain a new expert

and to depose him or her in the event the Court was satisfied with the reason for Dr. Chaiken's withdrawal. Counsel did so.

Dr. Edelberg was deposed prior to the pretrial conference. As a result of information the defendants learned during that deposition, they believed Dr. Edelberg would be unable to offer testimony which would satisfy the locality requirement contained in the statutory definition of malpractice, now labeled medical negligence. The defendants' contentions arose in the context of a 1998 amendment to the statutory definition of medical negligence which removed the locality element and Dr. Edelberg's deposition testimony that a national standard of care applied. Since the defendants claimed this incident occurred in 1992 and the pre–1998 definition applied and Allen contended the 1998 definition applied, the Court ordered pretrial briefing. Dr. Imran filed his brief on November 2nd and Allen on November 7th.

Prior to the start of the trial on November 9th, the Court ruled that the definition/elements of what constitutes medical negligence as contained in the law in 1992 applied to this case. As to Dr. Edelberg's qualifications as a standard of care expert, he had to satisfy the statutory requirements [2] even though those requirements had been eased by a law enacted in 1996. While the defendants contended that his deposition testimony showed his unfamiliarity with the local standard of care, the Court declined to rule that his deposition rendered his trial testimony inadmissible.

Dr. Edelberg's trial testimony showed that he has little connection to Delaware. He has never practiced in this state nor has he even been in a Delaware hospital. The standard of care which he believed applied in August 1992 was a national standard. If fetal monitoring shows certain kinds of heart rate decelerations, he said, the doctor should assume the worst until proven otherwise. Whenever there are non-reassuring results on fetal moni-

2.  18 *Del. C.* § 6854.

toring which suggest oxygen supply problems, further testing should be done. One of the functions of fetal monitoring is to note the relationship between the mother's contractions and decelerations.

Dr. Edelberg testified his examination of Allen's monitoring strips from August 9–10 showed that the first strip was non-reassuring and that the relationship of the decelerations to the contractions was unclear, i.e., whether they were early or late and, if late, they could indicate a lack of oxygen problem. He believed a doctor should have been at Allen's bedside to clearly note the time of the contractions. The second strip, he said, showed a big deceleration, even though the fetus was still neurologically intact at this point. Again, there had to be some better way to monitor the correlation of Allen's contractions to the decelerations. The final strip, Dr. Edelberg opined, was non-reactive, non-reassuring.

Based on Dr. Imran's telephone call to Dr. Dworkin describing what had happened earlier on August 10th, including Allen's AMA departure, Dr. Edelberg believed Dr. Dworkin had enough information to know to order further testing. His failure to do so was a violation of the standard of care in one of two ways. Dr. Dworkin should have performed either a fetal monitoring test on Allen in his office when she came in on the 10th or sent her back to the hospital for an oxytocin test. Such a test induces contractions and when done in connection with fetal monitoring, enables the examiner to relate the timing of contractions to decelerations. Listening to the fetal heart with a stethoscope, as Dr. Dworkin did, tells you only that the baby is alive. Neither ultrasound nor a stethoscope pick up the variability the doctor needs to know, he said.

The biophysical profile test which Dr. Dworkin performed on August 11th was inadequate, too, and constituted another breach of the standard of care. There was no fetal monitoring on the 11th. If there had been, Dr. Edelberg believes the danger signals he said were found in the August 9–10 strips would have been present and a C-section would have been done and at that time, the 11th, the fetus was neurologically intact.

Dr. Edelberg criticized Dr. Dworkin's record keeping. He cited to Dr. Dworkin's August 10th note that said only that Allen had been in the hospital for contractions and that her cervix was closed. There was no mention of the monitoring results. The fetal heart rate which Dr. Dworkin heard on August 10th was noted as "OK." There was nothing in Dr. Dworkin's August 11th notes about Dr. Imran's call to him. Dr. Edelberg testified that when sharing patient care with other physicians, doctors should keep good records; it is only good medical practice. He believed Dr. Dworkin's records, or lack of them, about his phone call from Dr. Imran and his own office notes were insufficient.

Dr. Edelberg agreed that the fetus was neurologically intact through August 12th. He concurred that the fetus' loss of oxygen was due to a fetal to maternal bleed. While acknowledging that there can be various treatment approaches, he opined that this case was straight forward; what was not done in Dr. Dworkin's office was "catastrophic." Dr. Dworkin should have done fetal monitoring sooner and the biophysical profile was an inadequate follow-up test to the August 9–10 monitoring results.

Since Dr. Edelberg offered his view of this standard of care in this case as national, Allen offered Dr. Lazarus Kirifides as a "bridging" expert. He has been a practicing obstetrician/gynecologist in Delaware since 1961. The standard of care, he said, is regional and is the same for Wilmington, Baltimore and Philadelphia but was not specific about what the standard of care was. Dr. Kirifides said there was no national standard of care applicable to this case. He offered no testimony concerning the defendants' treatment in this case.

Dr. Ronald Bolognese testified as a standard of care expert for Dr. Dworkin. He is an obstetrician/gynecologist sub-specializing in maternal-fetal care, which, he said, is care of expectant mothers who are at risk for a poor outcome of pregnancy. He practices at the Jefferson Medical Center in Philadelphia and chairs their OB/GYN Department. He teaches at Jefferson Medical School, he testified, where they teach a lot of Delaware doctors and Jefferson is the equivalent of this State's medical school. He gets referrals from Delaware doctors and also sees patients who live in Delaware who come directly to him.

Dr. Bolognese reviewed for the jury the fetal monitoring strips/tracings from August 9–10. The early strips looked good, he said. There was good beat-to-beat variability. An appearance of some decelerations was due, in his opinion, to cord compression. As the tracings continued, however, the variability looked "less good" which he believed prompted the desire of the hospital staff for Allen to stay for further testing. He noted the strips showed some prolonged decelerations which he attributed to Allen's position since when she moved, the decelerations stopped. In sum, he told the jury that the strips did not show any "major amount" of fetal distress.

The examination which Dr. Dworkin performed on August 10th did not breach the standard of care, according to Dr. Bolognese. Nor was the standard of care breached by not doing any other tests on that date. Specifically, he said, the standard of care was not breached on the 10th when Dr. Dworkin did not send Allen back to the hospital for an oxytocin test. Dr. Bolognese did say that the strips taken on August 9–10 did demonstrate a need for additional studies within 24 to 48 hours and Dr. Dworkin complied with that requirement by his biophysical profile test on August 11th. Several follow-up tests to the August 9–10 fetal monitoring could be used. Oxytocin is one but so is a biophysi-cal profile. At one time, the oxytocin test was, he said, the "gold standard" but as other tests came along, it was used less. There is no clear data that one test is superior to the other.

The biophysical profile test in Dr. Bolognese's opinion would answer the questions raised by the August 9–10 fetal monitoring. The developer of the biophysical test has indicated that with a score of 8 out of 8, such as here, there is no need to do fetal monitoring. Therefore, Dr. Bolognese said, Dr. Dworkin did not breach the standard of care by not doing a fetal monitoring test on August 11th. With the August 11th test result in this case, a doctor could wait up to a week to do any follow-up. Here, Dr. Dworkin followed up three days later, so in that regard, too, he complied with the standard of care. The tests on the 14th showed fetal stress problems to which Dr. Dworkin immediately and, without dispute by anyone, correctly responded. In short, Dr. Dworkin's care from August 10th through the 14th met the standard of care.

Dr. Bolognese agreed that there was an acute and chronic fetal to maternal bleed. While bleeding was occurring prior to August 14th, it was small and not causing any fetal distress. He agreed that the lack of oxygen being carried to Kenza's brain caused her cerebral palsy. Whatever caused her bleeding to become acute came within 24 hours of her birth.

On cross-examination. Dr. Bolognese was asked about Dr. Dworkin not noting in his records what Dr. Imran told him in the telephone call early in the morning on the 10th. He testified the best medical practice would have been for Dr. Dworkin to have made a record of what Dr. Imran said and to indicate what follow-up was required. The trial record was that Dr. Dworkin did not write down what Dr. Imran said. During this cross-examination, the Court gave a cautionary instruction to the jury distinguishing between good medical practice and standard of care.

Prior to closing arguments, Allen indicated she wanted to argue to the jury that Dr. Dworkin's' failure to record Dr. Imran's call explained why he did not send her back to the hospital on the 10th for a follow-up test. If he had recorded Dr. Imran's telephone conversation, she contended Dr. Dworkin would not have allowed the lack of oxygen to continue. As a matter of fact, the defendants submitted prayers on the issue of good medical practice. The Court precluded Allen from arguing that the failure to follow good medical practice explained the events here. Based on that ruling, the Court declined to give the defendants' proposed instructions on this issue.

After over six hours of deliberations on a Friday and a Monday, the jury found that neither doctor committed medical negligence.

## DISCUSSION

Allen's grounds for a new trial will be discussed separately.

### A

■ Her first claim is that the verdict is against the great weight of the evidence. A jury's verdict is presumed to be correct.[3] When considering a motion for a new trial, the Court must determine whether it is against the great weight of the evidence.[4] A jury's verdict will not be set aside unless it is so clearly wrong as to indicate that it was a result of passion, prejudice, partiality or corruption or it is clear that the jury disregarded the evidence or the rules of law.[5]

■ Allen argues that Dr. Dworkin accepts and accepted the proposition that when there are possible signs of problems, a doctor should assume the worst until the worst is disproved. By not assuming the worst on August 10th after his conversation with Dr. Imran, Dr. Dworkin did not perform the necessary follow-up tests in a timely fashion and breached the standard of care.

Dr. Bolognese testified, however, that Dr. Dworkin met the standard of care. He performed the biophysical profile within the acceptable time following the August 9–10 tests. And, because that profile resulted in a score of eight out of a possible eight, there was no need to do fetal monitoring at that point. Dr. Edelberg said the standard of care dictated an oxytocin or other test on the 10th and a fetal monitoring test on the 11th. Dr. Bolognese said the standard of care required neither. The jury was acting within its province as fact-finder to accept the testimony of Dr. Bolognese over that of Dr. Edelberg.[6] In sum, there was ample evidence to support the jury's finding that Dr. Dworkin had not breached the standard of care.

Allen's motion for a new trial challenges the jury's verdict only as to Dr. Dworkin but not Dr. Imran. The Court, therefore, concludes that she is waiving or abandoning any claim against Dr. Imran.[7]

### B

■ In her motion for a new trial, Allen contends, "[s]tatistics show that in this community, an overwhelmingly high percentage of jury trials in medical malpractice cases end in defense verdicts."[8] Allen presents no statistics in her motion and has not done so at any time this case has been in this Court. She argues these "sta-

3. *Young v. Frase*, Del.Supr., 702 A.2d 1234, 1236–37 (1997).

4. *Burgos v. Hickok*, Del.Supr., 695 A.2d 1141, 1145 (1997).

5. *Storey v. Castner*, Del.Supr., 314 A.2d 187, 193 (1973).

6. *DiSabatino Bros., Inc. v. Wortman*, Del. Supr., 453 A.2d 102, 106 (1982).

7. *Outten v. State*, Del.Supr., 720 A.2d 547, 550 (1998) n. 1; *see William H. Porter, Inc. v. Edwards*, Del.Supr., 616 A.2d 838 (1992).

8. Plaintiff's motion for new trial, ¶ 5.

tistics" required the Court to use the *voir dire* questions she submitted.

On the morning of the first day of trial, Allen submitted 19 proposed *voir dire* questions. The 19th, and last, listed witnesses and is given as a matter of course in the standard jury selection questioning. Her questions covered a range of topics such as: "Have you or any of your friends or family every received unsatisfactory medical care?" "If a jury assesses a large damage award against a doctor, do you believe your medical expenses or health insurance premiums will go up?" "What is your general feeling toward the health care industry today?" [9]

■■■ The Court declined to use Allen's proposed *voir dire* questions. The goal of *voir dire* examination is to seat an impartial jury that will decide the case on the evidence presented and follow the Court's instructions on the law.[10] Allen's proposed *voir dire* went far beyond that goal. Questions about insurance are disfavored.[11] In addition, Delaware has a long-standing tradition of keeping *voir dire* examination to a minimum.[12] The Court viewed many of Allen's proposed *voir dire* to be vague or general. As to the remainder of her proposed *voir dire*, the Court believed two routinely given questions and two particularized questions for this case provided a means of finding an impartial jury. The routine questions were:

> Do you have any basis or prejudice either for or against the plaintiff or defendants?

> Is there any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?

The special questions for this case which were posed to the array were:

> Does any member of the jury panel know of any reason why he or she would be unable to award money damages in favor of the plaintiff, if the evidence and the law so required, or conversely, to return a verdict in favor of either or both defendants, if the evidence and law so required?

> Does any member of the jury panel have preconceived opinions or attitudes about medical negligence cases in general, or about lawsuits against hospitals, doctors or other health care providers that might interfere with your ability to render a fair and impartial verdict in this case?

The unsubstantiated statement about statistics does not support Allen's argument that her questions should have been used instead of the Court's questions. In sum, this claim for a new trial is without merit.

### C

■■■ Allen's next claim which she argues entitles her to a new trial is the admission into evidence of the redacted AMA document. She objected pretrial to any reference about leaving against medical advice and to the admission of even the redacted form, though apparently willing to stipulate she signed such a document. She renews her objection to its admission and contends she was prejudiced by the defendants' repeated reference to it.

As noted earlier [13], the Court ordered several redactions to the AMA document. One part redacted entirely was a hold harmless agreement between Allen and the Medical Center of Delaware. Just prior to the original trial date in 1997, Allen dismissed (without settlement) her claim against the Medical Center. That act ren-

9. Plaintiff's *voir dire* questions.

10. *Hughes v. State*, Del.Supr., 490 A.2d 1034, 1041 (1985).

11. *Pinkett v. Brittingham*, Del.Supr., 567 A.2d 858, 862 (1989).

12. *Chavin v. Cope*, Del.Supr., 243 A.2d 694, 697 (1968).

13. *Supra* at 114–15.

dered the hold harmless agreement irrelevant. Later, Allen withdrew her own cause of action against these defendants leaving only Kenza's damage claim. In the Court's view, that plus Delaware law regarding parental immunity[14] rendered irrelevant, if not unduly prejudicial[15] the handwritten words concerning risk, "Death to infant & Patient."

On the other hand, the hospital records clearly showed Allen departed against medical advice. She, however, denied that and said she and her baby were fine and that it was okay to leave. Her testimony and that of Dr. Imran differed over whether he was to meet her at the hospital. Allen disputed what Dr. Imran may have said to Dr. Dworkin. She contended at trial that he may have left something out during that telephone conversation which, if he did, led her to claim he committed medical negligence. Dr. Imran testified that he did not leave out certain information and one reason he was so sure was that Allen was the first patient he had in years of practice who had left the hospital against medical advice. This lead him to more readily recall the conversation. Finally, Dr. Dworkin testified that Dr. Imran said Allen left against medical advice and this was important for him in what he did as a follow up. Learning of her AMA departure, Dr. Bolognese testified, imparted necessary information to Dr. Dworkin. For these reasons, the Court viewed the redacted AMA document as admissible.

The defendants repeatedly referred to the AMA document during the trial. When they sought to introduce it, they referred to it as "redacted." The Court viewed the use of that word as ill-advised. The repeated reference to it, however, raised a concern in the Court's mind that the defendants were seeking to blame Allen for what happened here. That being so, when the AMA document was introduced, a cautionary instruction was given.

Ladies and gentlemen of the jury, the Court has allowed testimony and evidence about Donna Allen, now Mrs. Tyler, leaving Christian Hospital on August 10, 1992. The Court has allowed this testimony for limited purposes, namely, on the issue of credibility and to explain the circumstances of events in this case. You will use this evidence for these purposes only. The evidence of leaving against medical advice has nothing to do with the cause of any injury to Kenza Tyler and must not be used or considered by you in any way in reaching your verdict other than for the limited purposes I have just mentioned.

In its closing instructions, the Court reminded the jury that where evidence had been admitted for a particular purpose, it was to use that evidence only for that purpose. To insure that Allen's action would not be used against Kenza's case, the Court fashioned two additional instructions. One was a (first time) modification to the instruction on the nature of the case and an explanation of the parties in the case which stated:

Since Kenza Tyler is a minor and is and will never be competent to handle her own affairs, this Court appointed Mrs. Tyler to represent Kenza Tyler's interests in this litigation. Such a person has, in a case like this, the title of guardian *ad litem*. If you make an award for the plaintiffs, you should understand that such an award will be placed in a special trust account for Kenza Tyler. By explaining this to you, the Court does not mean to suggest for whom your verdict should be rendered. Hereafter, I will refer only to Kenza Tyler, as she is the real party in interest in this case.[16]

The other was a specific limiting instruction and stated:

---

**14.** *Sears, Roebuck & Co. v. Huang,* Del.Supr., 652 A.2d 568 (1995).

**15.** D.R.E. 403.

**16.** Jury Instructions at 4.

**122**

### LIMITING INSTRUCTION

You have heard evidence that Mrs. Tyler left Christiana Hospital against medical advice. The Court permitted this evidence for two reasons. One, as it relates to any issue of credibility and, two, to explain the circumstances of this case. There is no evidence nor do the defendants claim that Mrs. Tyler's action caused any injury to Kenza Tyler. If you find that Mrs. Tyler left the hospital against medical advice and even if you find that conduct was negligent, you must not use that finding as a reason to render a verdict in favor of either or both of the defendants.[17]

The Court maintains the view that the AMA document as redacted and the testimony of Allen's departure against medical advice were relevant to issues of credibility of Dr. Imran, Allen and Dr. Dworkin. Further, the events in this case could only be understood in the context of that document and departure. Therefore, it was not error to admit it.

### D

■ The next ground which Allen claims entitled her to a new trial is that this Court erred in preventing her from arguing to the jury that Dr. Dworkin failed to follow good medical practice by failing to record in his notes that Dr. Imran told him Allen had a non-reassuring, non-reactive strip. Since such a strip augurs lack of oxygen, it is inconceivable, she contends, that Dr. Dworkin would have allowed that condition to continue without renewed fetal monitoring within 48 hours. In making her argument now, Allen points to the testimony of Dr. Bolognese.

Allen's argument is flawed in several respects. First, she must show that Dr. Dworkin's medical negligence proximately

caused Kenza's injuries.[18] Neither Dr. Edelberg, who criticized Dr. Dworkin's record keeping, nor Dr. Bolognese testified that any inadequate record keeping by Dr. Dworkin caused any injury to Kenza. Nor did any other witness causally link any alleged poor record keeping to the injuries suffered.

The additional flaw in Allen's approach at trial and argument in her current motion is that there is a not-so-subtle attempt to equate poor medical practice with violating the standard of care. Again, neither Dr. Edelberg nor Dr. Bolognese testified that any standard of care required Dr. Dworkin to record certain information such as his conversation with Dr. Imran. While both experts may have been critical of the absence of information on Dr. Dworkin's notes, neither said a standard of care was breached.

Therefore, when Allen's counsel were cross-examining Dr. Bolognese at some length about good medical practice and Dr. Dworkin's record keeping, the Court was constrained to give a cautionary instruction to the jury:

> THE COURT: Ladies and gentlemen, I think it should be clear, there is a legal distinction between "good medical practice" and "standard of care."
>
> What we're talking about here is whether or not a standard of care was breached, not the question of "good medical practice," so we have to be very careful about terminology.[19]

Dr. Dworkin was concerned enough about the impact of this line of questioning that he proposed some instructions to be included in the Court's final instructions:

### ALLEGATIONS REGARDING MEDICAL NEGLIGENCE

I instruct you that you may not base your decision about whether or not Dr.

---

17. Jury Instructions at 17.

18. *General Motors Corp. v. Wolhar*, Del.Supr., 686 A.2d 170, 176 (1996); *Duphily v. Delaware Electric Co-op, Inc.*, Del.Supr., 662 A.2d 821, 828 (1995).

19. Excerpt from Cross–Examination of Ronald Bolognése, M.D., (November 17, 1998) at 3.

Dworkin and/or Dr. Imran were negligent in this case on whether certain entries were or were not made in their medical records. I have already ruled as a matter of law against plaintiff's claim in this regard. Although you have heard testimony that the defendants' failure to make certain entries in their records may not have been "good medical practice", this is not the same as a breach of the standard of care that proximately caused injury, and so this evidence cannot be the basis for a verdict against the defendants.[20]

Allen, too, submitted an instruction on good medical practice:

If you determine the defendant failed to comply with good medical practices, this is not sufficient by itself to find liability against the defendant. You may consider, however, a failure to comply with good medical practices as relevant on the issue of whether the defendant complied with the standard of care.[21]

■ The issue also became relevant because of some charts which Allen had prepared for use in closing argument and to which the defendants objected. The charts basically did what her proposed instruction stated (and her trial strategy was) to equate not following good medical practice to a breach of the standard of care. There was no evidentiary support for that linkage in this case and such a *per se* concept is not encompassed within any definition of medical negligence.

Allen's proposed instruction was plainly not a correct statement of the law. Further, for her to argue in summation as she proposed along these lines would be erroneous and misleading. The Court opted to (1) give neither side's instruction on good medical practice and (2) preclude confusion and error by preventing Allen's argument consistent with her proposed instruction, equating two concepts which could not be equated in this case. Her claim about good medical practice renewed in her motion for a new trial continues to lack merit.

*E*

■ Allen contends this Court erred in holding that the 1998 amendment to the statutory definition of medical negligence could not be retroactively applied to this 1992 case. The definition is found in the Health Care Malpractice Act. Since the definition of medical negligence is a matter of substantive law, the Court ruled the amendment could not be retroactive. At the same time, the Court ruled that the 1996 amendment to the statute governing the competency of standard of care expert witness, being procedural or evidentiary, could be retroactively applied.

The Court is confronted with these issues through a confluence of events starting, of course, with the fact that the cause of action arose out of events in 1992. Also, Dr. Edelberg was brought into the case around a month before the trial due to Dr. Chaiken's sudden withdrawal. When he was deposed, Dr. Edelberg said a national standard of care applied. Based on this, the defendants believed he would be unable to offer testimony that would satisfy the elements of medical negligence as it had been defined prior to the 1998 amendment. They raised their concerns at the pretrial conference and the Court ordered expedited briefing on the issue. The circumstances of Dr. Edelberg's late entry into the case are more fully discussed in Part F of this opinion.

Medical negligence used to be known as malpractice. In an enactment in 1976, malpractice was defined as follows:

"Malpractice" means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of

---

20. Dr. Dworkin's Supplemental Proposed Jury Instruction (November 19, 1998).

21. Allen's proposed instruction (Attachment to letter dated November 19, 1998).

every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed, under similar circumstances, *by members of the profession in good standing in the same community or locality,* and the use of reasonable care and diligence.[22] [Emphasis supplied.]

On July 7, 1998, this section was amended in several ways. One way was to relabel malpractice as medical negligence. But the amendment did more; it redefined malpractice/medical negligence as follows:

"Medical negligence" means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed in the same or similar field of medicine as defendant, and the use of reasonable care and diligence.[23]

Allen argues that the 1998 amendment giving a new definition to what is now called medical negligence must be read in conjunction with the current statute governing the qualifications of an expert witness offering standard of care testimony. Prior to 1996, that statute read:

(a) No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in the State.

(b) Any physician who has been in the active practice of medicine or surgery for at least the past 5 years and who currently practices in the State or within a state contiguous to the State and within a radius of 75 miles of the Capitol of the State shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred.[24]

That statute was substantially revised in 1996 so that it now reads:

No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify.[25]

The 1996 amendment to § 6854 did away with the "locality" requirement needed to be competent to testify about standard of care. Since this Court held § 6854 could be retroactively applied to this case, Allen contends it only makes sense to read it and the amended § 6801(7) together and apply it retroactively, too. She has also offered some legislative history in the form of some comments of the floor managers of the bill amending § 6801(7) to show (1) it was only a "technical" amendment and (2) it should have been applied retroactively. The Court does not deem it necessary to reach as far into the legislative process as Allen proposes in order to reach its conclusion reaffirming its holding that the 1998 amendment to § 6801(7) cannot be applied retroactively.

**22.** 18 *Del. C.* § 6801(7).

**23.** 18 *Del. C.* § 6801(7).

**24.** 18 *Del. C.* § 6854.

**25.** 18 *Del. C.* § 6854.

The statutory definition of medical negligence, formerly malpractice, enacted into law in 1976 was the codification of long-standing Delaware common law.[26] That common law can be found as expressed in prior cases as follows: "It seems clear from the plaintiff's case that the intern at the defendant hospital examined the infant plaintiff as any other doctor in the community would have examined her under like circumstances." [27] "The general rule is that a surgeon is bound to the same standards of care and competence as other surgeons in good standing ordinarily adhere to in the same or similar community." [28] "In Delaware it has been held that a surgeon is bound by the same standards of care and competence as other surgeons in good standing ordinarily adhere to in the same or a similar community." [29]

The Supreme Court in *McKenzie v. Blasetto* [30] recognized that there was a distinction in the legislature's amendment to § 6854 concerning expert qualifications. The Supreme Court acknowledged that the 1996 amendment to § 6854 eased the requirements for the admission of expert testimony but that any expert testifying about national standards still had to tie that standard to the standards in the same community or locality.[31] *McKenzie* was decided prior to the 1998 amendment to § 6801(7), of course, but it shows that being procedural, § 6854 can be applied retroactively.

Allen's contention that § 6801(7), as amended in 1998, can be retrospectively applied fails for several reasons. As noted, the enactment of § 6801(7) in 1976 defining malpractice was the codification of common law. The 1998 amendment clearly altered common law by removing the locality requirement which had so long been a necessary element a plaintiff needed to establish in a malpractice/medical negligence case. In this Court's view, the 1998 amendment is in derogation of common law and must be construed strictly against the party for whose benefit it was passed.[32] Plaintiff patients are the beneficiaries of this change.

The definition of standard of care is a substantive, not a procedural, matter.[33] To retrospectively apply a substantive change in a substantive law would be contrary to the strict construction principle. Further, there is no expression in the 1998 amendment itself that the new, less restrictive, definition of medical negligence would be retroactively applicable. Courts will not infer a retrospective application of an act absent a clear and unmistakable expression in the law itself that it is to receive such application.[34] The 1998 amendment evidences no such retroactive intent.

The legislature in 1998 may have sought to bring § 6801(7) into consonance with the 1996 amendment to § 6854. But, that does not mean that the substantive change to the definition of what constitutes standard of care has to have retrospective application. Further, it is not an anomaly to retrospectively apply the procedural § 6854 but prospectively apply § 6801(7).

**26.** *Riggins v. Mauriello,* Del.Supr., 603 A.2d 827, 830 (1992).

**27.** *Christian v. Wilmington General Hosp. Assoc., Inc.,* Del.Supr., 135 A.2d 727, 730 (1957).

**28.** *DiFilippo v. Preston,* Del.Supr., 173 A.2d 333, 336 (1961).

**29.** *Peters v. Gelb,* Del.Super., 303 A.2d 685, 686 (1973), *aff'd* Del.Supr., 314 A.2d 901 (1973).

**30.** Del.Supr., 686 A.2d 160 (1996).

**31.** *Id.* at 163.

**32.** *Stratford Apartments, Inc. v. Fleming,* Del. Supr., 305 A.2d 624, 626 (1973).

**33.** *Clayton v. Bartoszewski,* Del.Supr., 198 A.2d 692, 694 (1964); *see also Monsanto Co. v. Aetna Casualty and Surety Co.,* Del.Super., C.A.No. 88C–JA–118, 1994 WL 46726, Ridgely, J. (January 14, 1994).

**34.** *Chrysler Corp. v. State,* Del.Supr., 457 A.2d 345, 351 (1983).

As *McKenzie* says, the doctor who qualifies under § 6854 would still have to show that the standard is one employed by physicians in the same community or locality.

Allen points out that retrospective application of § 6854 but prospective application of § 6801(7) will result in two categories of cases, those where the events took place before the 1998 amendment and those after. In that respect, Allen is correct but that observation should not result in violating other principles enunciated in this opinion.

The law on § 6801(7) prior to the amendment is clear. There is no reason it cannot continue to be applied until all pre-amendment causes of action are disposed of. In basic terms, *McKenzie* supplies the path to follow and shows there is no ambiguity between § 6801(7) to § 6854. Nor should any supposed difficulties in the judicial administration of two categories of cases brought about by this legislation outweigh the need to measure the conduct of health care providers by the standard's applicable at the time of their actions.

Allen cites to legislative comments when the 1998 amendment was being considered to contend that it was but a technical follow-up to the 1996 amendment to § 6854. The Court sees no ambiguity in the 1998 amendment which would allow it to delve into the legislative debate.[35]

In conclusion, consistent with applicable Delaware law, Allen had to show that the claimed national standard for Kenza's care applied to Delaware. Under applicable law, to do this, she could use an expert such as Dr. Edelberg who met the qualifications of an expert witness under the amended § 6854. The Court did not err in holding the pre–1998 language of § 6801(7) applied to this 1992 case nor in instructing the jury in accordance with the pre–1998 Delaware law.

*F*

■ The next basis for which a new trial is sought surrounds the involvement of Allen's "bridging" expert, Dr. Kirifides. To understand this contention, some background context is needed.

In July 1996, the Court set a September 15, 1997 trial date for this case, anticipating it would take two weeks. Allen had retained Dr. Chaiken as her standard-of-care expert to be used at that trial. Dr. Chaiken was deposed on September 4, 1997. Either on that occasion or in an earlier opinion report, Dr. Chaiken opined that Dr. Dworkin had misread the biophysical profile. Whenever he first offered that opinion is unclear on this record, but at an office conference with counsel on September 11, 1997, it was represented that this claim of a breach was new. Allen's counsel did not disagree with the freshness of this opinion. Being very recent and on the eve of trial, the Court indicated it would continue the trial, as the defendants requested, or permit the trial to proceed but without this new claim of medical negligence. Allen chose to continue the trial in order to be able to pursue this particular claim of medical negligence. On September 16, 1997, a new trial date was set with the two-week trial to start on November 9, 1998.

On October 5, 1998, the Court received a letter from Allen's counsel saying Dr. Chaiken was withdrawing from the case. No reason was given for the withdrawal. In light of the age of the case, the prior continuance and imminency of the trial, the Court wanted to know why Dr. Chaiken was withdrawing. In its own letter of October 5th, the Court ordered counsel to proceed with deposing the new expert in the event Dr. Chaiken was let out. Counsel gave permission to the Court (which also had suggested letting another judge examine the reasons) to learn from Dr. Chaiken's Maryland counsel the reasons for the withdrawal and to examine them *ex*

**35.** *Hudson Farms, Inc. v. McGrellis*, Del. Supr., 620 A.2d 215 (1993).

*parte*. The Court received a letter, reviewed it *ex parte*, and the reasons offered convinced the Court that Dr. Chaiken should be allowed to withdraw. The reasons had nothing to do with this case or anything Allen or her counsel did. The letter was placed under seal for any subsequent review.

Dr. Edelberg became Allen's new standard-of-care expert. The circumstances of how the interplay of the 1998 amendment and his testimony became a matter of contention have been described.[36] Expedited briefing was ordered on October 27th and completed on November 7th. Before the trial commenced on November 9th, the Court ruled that the 1998 amendment could not be applied retrospectively. It declined at that moment to rule whether Dr. Edelberg's testimony could satisfy the test of local or community standards.

Allen accuses Dr. Dworkin of sandbagging in that he raised the issue of the 1998 amendment and its relationship to Dr. Edelberg's testimony only just before the trial. Part of this sandbagging claim appears to be that Dr. Edelberg did not believe, as Dr. Chaiken did, that Dr. Dworkin had misread the biophysical profile.

While all of this so far does not address Allen's argument concerning Dr. Kirifides, it is appropriate to address this part of her claim. Since Dr. Chaiken would have testified in 1997, the issue of the 1998 amendment could not have been raised. Whether he was able to meet the locality standards' requirements in the definition of medical negligence will never be known. It is unfair to accuse Dr. Dworkin of raising the issue of the 1998 amendment on the eve of trial when the statute had not been amended in 1997.

In addition, Dr. Chaiken's reasons for withdrawing had nothing to do with any party in this case. His withdrawal came just over a month before the trial. Allen was able to quickly find a replacement expert and the parties were able to depose him promptly. Until the deposition, it was impossible for Dr. Dworkin to know whether the locality issue existed. Twenty-two days after being notified that Dr. Chaiken was seeking to withdraw, Dr. Dworkin raised the "locality" issue at the pretrial conference. The Court cannot view any of this as sandbagging or anything else warranting a new trial. Surely, by raising the issue at the pretrial, Dr. Dworkin put Allen on notice of the issue in as timely a fashion as possible. Further, Allen did not request a continuance.

The Court ruled on November 9th that the 1998 amendment could not be retroactively applied to a 1992 occurrence. Allen claims, therefore, she needed to find a bridging expert[37] on an "emergency" basis. Her motion for a new trial in connection with the claim of Dr. Kirifides then makes the following curious statements:

> When plaintiff's counsel contacted Dr. Kirifides and asked if he would testify, Dr. Kirifides agreed to do so stating that it was his opinion that there was a national obstetrics standard. Plaintiff's counsel asked Dr. Kirifides if he wanted to know who the defendants were, and Dr. Kirifides said it did not matter. After the trial started, Dr Kirifides learned the identity of the defendants and stated that he would not testify because the defendants are his friends. Dr. Kirifides was eventually persuaded to testify despite his relationship with the defendants, but he changed his opinion and stated that there was not a national standard but instead a regional standard. When Dr. Kirifides appeared in the office of Dr. Dworkin's attorney for his discovery deposition, also present

---

**36.** *Supra* at 116.

**37.** When a plaintiff in a medical negligence case contends that a national standard of care applies but the defense states, however, the applicable standard is local, the plaintiff must provide an expert who makes the bridge between the national standard and the standards in Delaware. *Baldwin v. Benge*, Del. Supr., 606 A.2d 64, 68 (1992).

were Dr. Imran, Dr. Dworkin and Dr. Hochman. Plaintiff objected to the presence of these individuals, but the deposition went forward despite this objection. These doctors were present for the sole purpose of intimidating Dr. Kirifides, thereby affecting the opinions he testified about.[38]

Presumably, these statements are an attempt to explain why Dr Kirifides allegedly changed his opinion that a regional, not a national, standard of care applied; a region, by the way, in which he included Baltimore. Dr. Kirifides testified by means of a trial deposition. It is only appropriate that the parties themselves be present as they would be at trial. Dr. Hochman is associated with Dr. Dworkin and participated in Kenza's postpartum care and there were records he generated to which there was reference, including by Allen, during the trial. The Court sees no reason why he, too, could not be present.

Allen's allegations stated above are just that. There is no affidavit and no record support. The Court was not contacted during the taking of his trial deposition and asked to determine whether the two defendants and Dr. Hochman could be there. The issues of their presence or alleged intimidation were not raised during the deposition, during the reading of his deposition in Court two days later, or at any other time until noted in the motion for a new trial. If asked during the deposition, the Court would have permitted the three doctors to remain. These grounds for a new trial are without merit.

Further, the record contradicts Allen's other allegations. The defendants were informed on November 11, 1998 that Dr. Kirifides would be the bridging expert. In the letter to defense counsel from Allen's counsel informing them of that, it is indicated he would testify that there was a regional standard. Dr. Kirifides testified that when first contacted by plaintiff's counsel, he said there was a national standard but called him later to say it was regional. Only later did Dr. Kirifides learn of the defendants' names and while being reluctant to testify, did maintain the standard of care was regional. No inference of intimidation can be drawn from this.

Any claim involving Dr. Kirifides which Allen argues requires a new trial is meritless.

## CONCLUSION

Based on the foregoing reasons, the motion for a new trial by plaintiff Kenza Tyler is **DENIED**.

---

**38.** Plaintiff's motion for new trial, ¶ 4.