Gloria J. BALDWIN and Walter J. Baldwin, Plaintiffs Below, Appellants,

v.

John H. BENGE, M.D., Defendant Below, Appellee.

Supreme Court of Delaware.

Submitted: Jan. 14, 1992.
Decided: March 10, 1992.

Melanie K. Sharp (argued), and Ben T. Castle of Young, Conaway, Stargatt & Taylor, Wilmington, for appellants.

Victor F. Battaglia (argued), and Philip B. Bartoshesky of Biggs and Battaglia, Wilmington, for appellee.

Before HORSEY, MOORE and HOLLAND, JJ.

HORSEY, Justice.

In this medical malpractice case, plaintiffs appeal from Superior Court's grant of a directed verdict for the defendant physician, and defendant cross-appeals. The appeal involves the Delaware statutory standards for determining the competency of a medical malpractice expert witness to testify under 18 *Del.C.* § 6854 as to a deviation from acceptable standards of care in the administration of a nationally used prescription drug. We conclude that Superior Court did not commit legal error in its construction of the competency requirements of the Delaware medical malpractice statute. We further find that, under the facts of this case, the court did not abuse its discretion in finding plaintiffs' expert unqualified under section 6854(b) to testify concerning the applicable standard of care for administering and monitoring a nationally known and used prescription drug. We therefore affirm the decision below and do not reach the other issues raised on appeal.

## I. BACKGROUND

Plaintiffs are Gloria J. Baldwin ("Mrs. Baldwin") and Walter J. Baldwin ("Mr.

Baldwin"). Defendant, Dr. John H. Benge, admitted Mrs. Baldwin to St. Francis Hospital in Wilmington, Delaware, on January 6, 1985 for treatment of ulceration and cellulitis, an infection of her left foot.[1] Beginning on January 12, 1985, Dr. Benge ordered Mrs. Baldwin to be treated with Gentamicin, a prescription antibiotic, to be administered intravenously at the rate of eighty milligrams every ten hours. Dr. Benge had previously used Gentamicin in his practice, and was aware that the drug was commonly known to have adverse side effects. Specifically, Gentamicin was known to be nephrotoxic, or toxic to the kidneys, and could therefore impair kidney function. The drug was also known to be injurious to the nervous system, especially the eighth cranial nerve, and could consequently cause loss of balance, dizziness or vertigo. Because of the known adverse side effects of Gentamicin, Dr. Benge ordered plaintiff's serum creatinine level to be tested daily. The level of creatinine in the blood is an indication of the sufficiency of kidney function; by monitoring creatinine levels, a physician can monitor the effect of Gentamicin on kidney function and detect any damage.

On admission, Mrs. Baldwin's creatinine level was 1.2 milligrams per deciliter. On January 17, in the sixth day of the drug's administration, the creatinine level was 1.4; on January 18, it was noted by Dr. Benge to be 2.0. On January 20, Mrs. Baldwin first complained to Dr. Benge of a problem with her balance. On January 21, following consultation, Mrs. Baldwin was transferred to the service of Dr. Neil DeLeeuw for debridement, or removal, of infected growth from the surface of her left foot. After surgery, Dr. DeLeeuw ordered resumption of the original Gentamicin dosage. Between January 24 and January 26, Dr. Benge suspended the administration of Gentamicin because he was satisfied with Mrs. Baldwin's progress; Dr. Benge thereafter resumed his prescription of the original dosage until February 1, 1985. On that date, Dr. Benge noted a "significant jump" in plaintiff's creatinine level from 3.0, noted on the 28th (from a test performed on the 26th), to 4.9. Mrs. Baldwin had first complained of dizziness on January 20, and from February 1 onward, she continued to complain of both dizziness and loss of balance, until her discharge on March 15, 1985. On February 1, Dr. Benge told Mrs. Baldwin that her loss of balance was caused by Gentamicin.

In a suit filed in Superior Court on January 23, 1987 against Dr. Benge, Mrs. Baldwin alleges permanent loss of balance, requiring constant use of a walker, to have been the proximate result of Dr. Benge's negligent monitoring of his administration of Gentamicin.[2]

Before trial, defendant filed a motion *in limine* to exclude the testimony by deposition (taken by defendant) of plaintiffs' expert, Dr. Brent G. Petty, a physician at Johns Hopkins University Hospital in Baltimore, Maryland. Defendant contended that plaintiffs had not established that Dr. Petty was competent to offer expert testimony under the Delaware medical malpractice statute as to the applicable standard of care controlling the administration and monitoring of Gentamicin in the Wilmington medical community.

1. Mrs. Baldwin, 65 years old, had been under the care of Dr. Benge, a general physician, for a number of years for a variety of illnesses. These included diabetes mellitus, diagnosed in the early 1970's, for which she received daily injections of insulin. By 1978, Mrs. Baldwin had developed serious foot and leg ulcerations, and by 1980, she had ceased working, under a permanent medical disability, due to an inability to stand. In 1984, her left foot ulceration was so severe that a general surgeon suggested that amputation was necessary. After admission, and before January 12, Mrs. Baldwin was seen by a vascular surgeon and by an orthopedic surgeon. Lab tests of her left foot indicated she was suffering from osteomyelitis, a severe bacterial infection of the bone.

2. Prior to trial, defendant moved for summary judgment on the ground that plaintiffs' claim was barred by the statute of limitations, 18 *Del.C.* § 6856. The trial court found plaintiffs' suit not to be time barred. The court disagreed with the appellee physician that the continuum of his allegedly negligent treatment of Mrs. Baldwin was interrupted when Dr. DeLeeuw was consulted and, on January 21, 1985, performed an operation of a cosmetic nature on her severely infected foot.

In response, plaintiffs asserted that either their expert, Dr. Petty, or the defendant physician, Dr. Benge (who would be called in plaintiffs' case in chief), would testify at trial that a "national standard of care" applied to the administration and monitoring of Gentamicin, based on a patient's creatinine level. The court declined to rule on the motion until it had heard plaintiffs' evidence, and stated that it would later entertain a motion for a directed verdict on that ground.

At trial, after calling Dr. Benge as an adverse witness, plaintiffs called Dr. Petty. Dr. Petty testified that Gentamicin had been available for at least thirty years and was used "nationwide" and in Europe. Dr. Petty further testified that due to the drug's known cumulative side effects, particularly to the kidneys and eighth cranial nerve, Dr. Benge's administration and monitoring of Gentamicin to Mrs. Baldwin departed from "acceptable standards of medical care." In essence, Dr. Petty testified that Dr. Benge should have discontinued Gentamicin or reduced its dosage earlier than he did, when Mrs. Baldwin's creatinine level first began to rise.

At the close of plaintiffs' evidence, defendant moved for a directed verdict, again raising the issue of Dr. Petty's qualification to testify that Dr. Benge had departed from "acceptable standards of medical care" in his administration of Gentamicin. Defendant asserted that plaintiffs had failed to produce any evidence of the standard of care for the administration and monitoring of Gentamicin in the Wilmington medical community, as required by 18 *Del.C.* § 6854 (*see* n. 3 below). The court granted defendant's motion, stating:

> In this case I am constrained to find that the plaintiff has failed to meet the burden of proof. There is no contention that Dr. Petty has any familiarity at all with the Delaware medical community. The argument presented is that there is and/or should be a national standard as to the administration of medicine. This argument was specifically considered and rejected in *Suarez v. Wilmington Medical Center*, found at 533 A.2d 1249.

> I decided this morning to allow the case to proceed because I wasn't clear as to what might be said by Dr. Benge that might essentially bridge the gap. That's the manner in which this defect has been overcome in other cases. And I did not find there was any testimony that rose to that level and on that basis I will grant the motion for directed verdict.

On plaintiffs' oral motion for reargument, the court allowed limited further examination of Dr. Benge, after which plaintiffs' motion for reargument was denied. Plaintiffs then docketed this appeal.

On appeal, plaintiffs concede that Dr. Petty did not qualify to testify under section 6854(a) because he evidenced no familiarity with medical practice standards in Wilmington, Delaware. However, plaintiffs argue that Dr. Petty qualified under section 6854(b) to express his opinion that defendant deviated from the applicable standard of care because Dr. Petty had established that the standard for administering and monitoring the drug for known adverse side effects was uniform throughout all medical communities. Plaintiffs contend that a fair reading of the testimony of Dr. Petty establishes that Gentamicin is administered and monitored according to national standards. Therefore, plaintiffs argue, the standard of care to which Dr. Petty testified as the practice at Johns Hopkins Hospital in Baltimore, was necessarily the same as, or equivalent to, the standard of care for administering and monitoring the drug in Wilmington.

Defendant argues to the contrary and, more specifically, that plaintiffs in fact offered no expert testimony of the existence of a national standard for administering and adjusting the drug's dosage according to a patient's creatinine level. Defendant further argues that plaintiffs offered no evidence that any asserted "national standard" actually applied in Wilmington, Delaware. Hence, defendant concludes, plaintiffs failed to establish that the standard of care for administering Gentamicin in Wilmington, Delaware, was the same as, or equivalent to, the standard for administering the drug at Johns Hopkins.

## II. STANDARD AND SCOPE OF REVIEW

In reviewing the Superior Court's construction of a statute, this Court will exercise *de novo* review for legal error. *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982). However, the Superior Court's determination that a particular expert witness is not competent to testify through failure to meet the legal standard will be reviewed as a finding of fact for abuse of discretion. *Loftus v. Hayden*, Del.Supr., 391 A.2d 749 (1978); *Peters v. Gelb*, Del.Supr., 314 A.2d 901, 903–04 (1973). Thus, two questions are presented: first, whether the Superior Court applied the correct legal standard in interpreting section 6854's requirements for determining Dr. Petty's competency to testify as to a departure from the applicable standard of care for administering the nationally known and used drug; and second, whether Superior Court abused its discretion in finding that evidence simply that a prescription drug is nationally used is insufficient to establish the applicable standard of skill and care for monitoring and administering the drug.

## III.

### THE ALTERNATIVE STANDARDS FOR ESTABLISHING COMPETENCY UNDER 18 DEL. C. § 6854

The Delaware expert witness statute, as amended in 1980, 62 Del.Laws c. 274, provides two methods by which a proffered expert can be found competent to testify as to the applicable standard of care.[3] Under section 6854(a), a person who is "familiar with that degree of skill ordi-

narily employed in the community or locality where the alleged malpractice occurred" may be found competent. Alternatively, a witness may qualify under section 6854(b). Subsection (b) requires that three conditions be satisfied in order to confer presumptive competency upon physician witnesses. First, the physician must have been in active practice "for at least the past 5 years." Second, the physician must currently practice in a state contiguous to Delaware and within 75 miles of Dover. Third, it must be established that "the degree of skill and care required" in the locality where the expert practices is the same or equivalent as that of the locality where the alleged malpractice occurred.

Plaintiff asserts that the Superior Court committed legal error in employing a blanket requirement that Dr. Petty be "familiar" with the local standard of care in order to be competent to testify. Had the court done so, it would of course have been legal error; this is the reason for subsection (b). However, it is evident from the ruling below that Superior Court, in summarizing the statute, correctly delineated the threefold requirement for an expert to qualify under section 6854(b). The court stated in its bench ruling:

> ... I have reviewed the statute that governs certain testimony in medical malpractice cases. That is found in 18 *Del.C.* § 6854, and there are two parts to that statute.

> The first part requires that the doctor who testifies be familiar with the standards of care in Delaware and the second part provides that a doctor who has been in active practice for more than five

---

**3.** 18 *Del.C.* § 6854 reads, in its entirety:

§ 6854. Expert witness.

(a) No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in the State.

(b) Any physician who has been in the active practice of medicine or surgery for at

least the past 5 years and who currently practices in the State or within a state contiguous to the State and within a radius of 75 miles of the Capitol of the State shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred.

years and practices within seventy-five miles from Dover is qualified or competent to give testimony as to the standard of care, so long as it be established that the degree of skill and care that is required of the expert in the locality where the expert practices or teaches is of the same or equivalent standards as the skill and care applied in the community or the locality where the malpractice occurred.

Moreover, by allowing further questioning of Dr. Benge on motion for reargument, the court implicitly recognized that the third condition of section 6854(b), "that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standard as the skill and care employed in the community or locality where the alleged malpractice occurred," could be satisfied through the "bridging" testimony of another medical witness. *See Butler v. Alatur*, Del.Supr., 419 A.2d 938 (1980). Consequently, we find plaintiffs' claim of legal error by the court in its construction of the requirements of section 6854(b) to be without merit.

## IV. APPLICATION OF THE STANDARD

■ It is undisputed that Dr. Petty did not qualify under subsection (a) of § 6854. Neither is it disputed that Dr. Petty satisfied the first two conditions of subsection (b). Plaintiffs claim, however, that the Superior Court abused its discretion in finding that the third condition of § 6854(b) had not been satisfied.

The thrust of plaintiffs' claim is that the third condition, or "equivalency" requirement, of § 6854(b) is met by testimony to the effect that the drug whose administration is in question is *used* "nationwide." This argument proves too much. Merely because a tool of medical practice, such as a prescription drug, is employed in many communities, does not mean that it is administered and monitored pursuant to the same standards in all communities. *See*

*Suarez v. Wilmington Medical Center, Inc.*, Del.Super., 533 A.2d 1249, 1252 (1987) ("[plaintiff's expert's] contention that the American Academy of Pediatrics recommendations embodies the standard of care as he knows it does not address whether those recommendations represent the same standard of care as that practiced in Dover, Delaware").

Section 6854(b) unambiguously requires that plaintiffs establish that the standards in the expert's community be equivalent to the standards in the community where the alleged malpractice occurred; here, Wilmington, Delaware. In this case, plaintiff has established through the testimony of Dr. Petty that Gentamicin is used widely in the United States and has been for many years. However, Dr. Petty's testimony that Gentamicin is *used* "nationwide" cannot by itself support an inference that it is administered and monitored nationwide pursuant to the same standards.[4] Furthermore, where a party attempts to satisfy the third condition, or the "equivalency" requirement, of section 6854(b), through witnesses asserting the existence of a "nationwide" standard, the party must also establish that the term "nationwide," as used by those witnesses, encompasses both the proffered expert's community and the relevant Delaware community. We find the trial court not to have abused its discretion in refusing to draw these required inferences from Dr. Petty's scant testimony, in light of the unambiguous statutory requirement that plaintiffs establish equivalency. 18 *Del.C.* § 6854(b).

This Court's holding in *Butler v. Alatur* does not require a contrary finding. Del. Supr., 419 A.2d 938 (1980). In *Butler*, "the record made by the plaintiff support[ed] 'a national or regional standard as to diagnosis and treatment.'" *Id.* at 939 (quoting *Loftus*, 391 A.2d at 753). The record further included testimony by a psychiatrist practicing in Delaware to the effect that the standards in the relevant Delaware

---

4. For instance, as the record indicates, laboratory analyses on the creatinine level of Gentamicin may be secured with varying levels of rapidity in different communities. Dr. Benge testified that lab results at St. Francis were not available until one to two days after the blood was drawn for the creatinine test.

community were equivalent to those of other communities throughout the Delaware Valley. *Id.* The record in this case contains no such evidence.

We find that plaintiffs failed to satisfy the statutory requirement of equivalency because they failed to establish the existence of "nationwide" standards for the administration and monitoring of Gentamicin. We decline to adopt any hard and fast rule concerning what evidence must be produced in order to find the existence of a truly "nationwide" standard of care. Instead, it will remain for the finder of fact in an individual case to determine whether a party seeking to establish equivalency through evidence asserting the existence of a national standard has in fact established a standard of care that is literally applied "nationwide," and therefore encompasses the relevant medical community in Delaware, or has merely established a standard of care with reference to medical communities having hospitals of the size and reputation in which the expert practices.

In the face of an insupportive record, plaintiffs assert that "as a practical matter," Wilmington is in the same medical community as "any metropolitan area in the country." For this Court to take judicial notice of such a proposition of medical fact would effectively eviscerate the expert witness statute. Whether such is in fact the case is an inquiry for a finder of fact in a particular case pursuant to § 6854(b), and is not a proper one for this Court.

\* \* \* \* \* \*

AFFIRMED.