Colette McKENZIE and Carmen McKenzie, husband and wife, individuals, Plaintiffs Below, Appellants,

v.

James BLASETTO, M.D., an individual, and Delaware Heart Group, P.A., a Delaware Professional Corporation, Defendants Below, Appellees.

No. 342, 1995.

Supreme Court of Delaware.

Submitted: September 24, 1996.
Decided: December 11, 1996.

Ben T. Castle, Melanie K. Sharp (argued), and Neilli Mullen Walsh of Young, Conaway, Stargatt & Taylor, Wilmington, for Appellants.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Appellees.

Before VEASEY, C.J., HARTNETT and BERGER, JJ.

BERGER, Justice:

This is an appeal from a defense verdict in a medical malpractice action. Appellants, Colette and Carmen McKenzie, contend that the jury was improperly instructed to use a local standard of care in deciding whether appellee, Dr. James Blasetto, committed malpractice. The McKenzies also object to the trial court's ruling that their counsel could not read passages from a medical text as part of his closing argument.

We hold that, pursuant to 18 *Del.C.* § 6801(7), a health care provider is subject to liability for malpractice only if he or she fails to meet the "standard of skill and care ordinarily employed, under similar circum-

stances, by members of the profession in good standing in the same community or locality...." Thus, even where a plaintiff establishes that there is a nationwide standard of care, the jury must decide whether that nationwide standard is applied locally and, if so, whether that standard was satisfied. The jury instructions in this case correctly stated the statutory standard of care. The trial court apparently did not explain that the jury could apply a national standard of care if it found that the national standard was the same as the Delaware standard. While such an instruction might have been helpful, we conclude that the instruction that was given was neither inaccurate nor misleading. We also find no abuse of discretion in the trial court's ruling on the use of medical texts during the closing argument. Accordingly, we affirm.

## I.

In August 1989, Carmen McKenzie, who was then 47 years old, went to see her family physician complaining of chest pain. The family doctor referred her to Blasetto for a cardiology consultation after a stress test indicated that the chest pain might be associated with coronary disease. The McKenzies met with Blasetto, who recommended that Mrs. McKenzie undergo a cardiac catheterization. While performing the catheterization, Blasetto tore McKenzie's left main artery. McKenzie was rushed into the operating room, and underwent emergency bypass surgery that saved her life.

The McKenzies filed suit against Blasetto and his professional association alleging malpractice both in the decision to do, and the performance of, the catheterization. The case was tried for the first time in 1994. Two cardiologists from Boston, Massachusetts, testified that Blasetto deviated from a national standard of care. Dr. Charles M. Blatt testified that the cardiac catheterization was unnecessary. According to Blatt, Blasetto should have conducted the non-invasive stress thallium test to determine whether McKenzie was suffering from any coronary artery blockage. Had he done so, Blasetto would have learned that there was no blockage and the catheterization would have been

avoided. Dr. Andrew Selwyn testified that Blasetto also deviated from the standard of care during the catheterization. Blasetto should have withdrawn the catheter and repositioned it when x-rays and pressure readings indicated that the end of the catheter was touching an artery wall. Blasetto compounded the error by attempting to inject dye into the artery while the catheter was lodged in a dangerous position. Dr. Irena Stolar, a practicing cardiologist in New Castle County, Delaware, testified that the national standard of care relating to cardiac catheterizations is the standard applied in Delaware. This "bridging" testimony by Stolar was necessary to qualify the two Boston doctors as competent expert witnesses.

After three days of deliberations, the jury was unable to reach a verdict, and the Superior Court declared a mistrial. Before the start of the second trial, the attorneys exchanged letters about the need for bridging testimony. Counsel for Blasetto suggested that, in order to save time, the parties "dispense with any trial testimony [on the] local standards issue." Counsel for the McKenzies agreed, stating that he had "no problem with submitting on the past record or a stipulation by counsel." The parties never entered into a written stipulation, although the Superior Court suggested that they do so. Instead, they went through the second trial with different understandings of their "agreement." The McKenzies believed that there was an agreement to use a national standard of care in measuring Blasetto's conduct. Blasetto understood only that there would be no need for bridging testimony in order to admit evidence of a national standard of care.

Because of these different understandings, problems arose even before the first witness took the stand. During opening arguments, Blasetto repeatedly referred to the standard of care used by an average cardiologist in Wilmington, Delaware. The McKenzies objected, arguing that the parties had stipulated to a national standard of care. The trial court found no basis for an objection either on the law or the stipulation. The court stated that the relevant standard of care was the community standard and that

the agreement between the parties related only to bridging testimony. The McKenzies did not dispute the scope of the parties' agreement as expressed by the Court. Counsel merely said, "Okay."

Blasetto continued to emphasize the local standard of care during cross-examination of the McKenzies' Boston doctors and in closing arguments. During the prayer conference, the McKenzies objected to the fact that the proposed jury instructions made no reference to a national standard of care. They offered a standard-of-care instruction that made no reference to any geographical area. The trial court did not alter its standard medical malpractice instruction, which included a restatement of the statutory definition of malpractice. The court suggested that the McKenzies could explain their national standard-of-care contentions to the jury during closing arguments.

The jury returned a verdict in favor of Blasetto and the McKenzies now appeal the Superior Court's denial of their motion for a new trial.

## II.

Medical malpractice claims are governed by the Health Care Malpractice Insurance and Litigation Act, 18 *Del.C.* § 6801 *et seq.* The Act defines malpractice as:

> [A]ny tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering professional services or health care to a patient shall be that degree of skill and care ordinarily employed, under similar circumstances, by members of the profession in good standing in the same community or locality, and the use of reasonable care and diligence. 18 *Del.C.* § 6801(7).

For most types of medical negligence, a plaintiff must present expert medical testimony that the defendant deviated from the applicable standard of care and that the deviation, or malpractice, caused the alleged injury. 18 *Del.C.* § 6853. That expert medical testimony may only be offered by a person who satisfies the requirements of 18 *Del.C.* § 6854:

> (a) No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with that degree of skill ordinarily employed in the community or locality where the alleged malpractice occurred, under similar circumstances, by members of the profession practiced by the health care provider; provided, however, that any such expert witness need not be licensed in this State.
>
> (b) Any physician who has been in the active practice of medicine or surgery for at least the past 5 years and who currently practices in the State or within a state contiguous to the State and within a radius of 75 miles of the Capitol of the State shall be presumed to be competent to give expert medical testimony as to applicable standards of skill and care, if it shall be established that the degree of skill and care required of the expert in the locality where the expert practices or teaches is of the same or equivalent standards as the skill and care employed in the community or locality where the alleged malpractice occurred.

When the expert witness statute was enacted, subsection (b) did not exist. There was only one way to qualify a medical expert witness and that was to establish that the witness knew the standard of care in the locality where the alleged malpractice occurred. This local standard requirement was designed to eliminate "wandering experts." *Loftus v. Hayden,* Del.Supr., 391 A.2d 749 (1978). Subsection (b), added by amendment in 1980, offered a second method of establishing a medical expert's competence to testify. Under § 6854(b), there were three requirements: (i) the medical expert had to be practicing in Delaware or a contiguous state within 75 miles of Dover; (ii) the expert must have been in active practice for at least 5 years; and (iii) the standard of care in the medical expert's locality had to be equivalent to the standard of care in the locality where the alleged malpractice occurred. The third requirement did not have to be satisfied by

the proffered expert. Another medical witness could provide bridging testimony to establish that the standard of care in the expert's locality was the same as the standard of care in the relevant Delaware locality. *Baldwin v. Benge*, Del.Supr., 606 A.2d 64, 68 (1992). Bridging testimony was required even in cases where the medical expert testified that there was a nationwide standard of care. "[T]he party must ... establish that the term 'nationwide,' ... encompasses both the proffered expert's community and the relevant Delaware community." *Ibid.*

The expert witness statute, which was amended again in 1996[1], addresses only the requirements for admission of expert testimony. It does not purport to modify the statutory definition of malpractice or otherwise alter the elements of a medical malpractice claim. Thus, although the expert witness may be from another state and may testify that there is a national standard of care, the jury still must find that the defendant deviated from the standard of care "ordinarily employed ... by members of the profession in good standing *in the same community or locality* ...." 18 *Del.C.* § 6801(7) (emphasis added).

The McKenzies argue that the trial court's failure to give a national standard-of-care jury instruction was contrary to the evidence presented and the parties' agreement. They contend that the "locality rule" is absurd and that the trial court's use of a local standard of care instruction misled the jury into believing that the McKenzies' evidence of a national standard of care had to be ignored.

The McKenzies may not insist upon a particular jury instruction, but they do "have the unqualified right to have the jury instructed with a correct statement of the substance of the law." *Culver v. Bennett*, Del.Supr., 588 A.2d 1094, 1096 (1991). The instructions need not be perfect, and this Court will not reverse as long as they are "reasonably informative and not misleading, judged by common practices and standards of verbal communication." *Haas v. United Technologies*

*Corp.*, Del.Supr., 450 A.2d 1173, 1179 (1982) (quotations omitted), *appeal dismissed,* 459 U.S. 1192, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983). Reversal is mandated only where the "alleged impropriety in the jury instructions undermined the jury's ability to intelligently perform its duty...." *Ibid.* (quotations omitted).

 We conclude that the jury instruction given by the trial court did not conflict with the parties' agreement and was a correct statement of the law. The record establishes that the parties agreed to waive the bridging testimony that otherwise would have been necessary to establish the competence of the out-of-state medical experts. There was no agreement as to the applicable standard of care and any confusion there may have been on this point was clarified at the beginning of the second trial, when the court restated the limits of the agreement. Thus, the only remaining question is whether, in light of the evidence of a national standard of care, the trial court should have modified its standard malpractice jury instruction to explain how a national standard of care could be applied.

The trial court's jury instruction included the statutory definition of malpractice (§ 6801(7)); a statement of the legal requirement that deviations from the applicable standard of care be proven by expert medical testimony (§ 6853); and a direction that the jury determine the applicable standard of care (*Baldwin v. Benge*, 606 A.2d at 69). That instruction was accurate, although not as complete as it might have been. In light of the evidence that was presented, the jury might have been told that it could apply a nationwide standard of care if it found that the nationwide standard was the same as the Delaware standard. *Ibid.* The McKenzies did not submit a proposed jury instruction addressing this point and the trial court, after discussing the matter with counsel, concluded that the McKenzies should explain the issue to the jury in closing arguments. We find no error in this approach. The jury

---

1. Section 6854 now provides:
 No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify. 70 Del.Laws Ch. 415, § 1.

instructions may not have been perfect, but they were not misleading or otherwise improper.

## III.

The McKenzies also argue that the Superior Court erred in precluding them from referring to medical texts in closing arguments. As part of his testimony at trial, Selwyn read into the record passages from medical texts addressing the standard of care for cardiac catheterizations. Selwyn adopted those passages as accurate statements of the standard of care and Dr. Morton J. Kern, one of Blasetto's medical experts, agreed. The McKenzies made blow-ups of the passages and attempted to read from them during closing arguments. Blasetto objected and the trial court ruled that the McKenzies could not read from the blow-ups or from the medical texts themselves. The trial court explained that the same information could be conveyed to the jury by referring to the medical experts' testimony, rather than the texts.

We find no abuse of discretion in the trial court's ruling. Pursuant to *D.R.E.* 803(18), learned treatises are an exception to the hearsay rule, "[t]o the extent called to the attention of an expert witness upon cross-examination, or relied upon by him in direct examination...." But the treatises may not be received as exhibits; they only may be read into evidence. *Ibid.* This restriction helps "ensure that the jurors will not be unduly impressed by the treatise, and that they will not use the text as a starting point for conclusions untested by expert testimony...." 4 *Weinstein and Berger, United States Rules,* ¶ 803(18)[02], page 803-375 (1995). The trial court's limitation on the use of medical texts during closing arguments addressed the same concerns by prohibiting direct reference to the treatise but allowing the relevant passages to be discussed through a review of the witnesses' testimony. We conclude that the trial court acted well within its discretion in imposing this limitation and in instructing the jury to disregard the wording in the treatise.

Based upon the foregoing, the decision of the Superior Court denying the McKenzies' motion for a new trial is AFFIRMED.