Lars Petter **BONESMO** and Solveig Bonesmo, Individually, and As Surviving parents of Ester Alnes Bonesmo, Plaintiffs,

v.

**THE NEMOURS FOUNDATION,**
Defendant.

No. C.A.01–395–SLR.

United States District Court,
D. Delaware.

Jan. 31, 2003.

Ben T. Castle, Esquire and Neilli Mullen Walsh, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, for Plaintiffs.

M. Duncan Grant, Esquire and Joseph S. Naylor, Esquire, Pepper Hamilton LLP, Wilmington, for Defendant.

## MEMORANDUM OPINION

THYNGE, United States Magistrate Judge.

### Background

This medical malpractice action was filed on June 10, 2001 by plaintiffs, residents and citizens of Norway, against defendant alleging that it was negligent and thereby caused the death of their daughter on June 12, 1999.[1] Fact discovery has occurred. Plaintiffs have identified two medical experts, Ann Kristin Olsson, M.D. and Ove Okland, M.D., both foreign physicians who practice in Sweden and Norway, respectively, whom they intend to call at trial regarding medical negligence, the standard of care and proximate cause. Although plaintiffs have offered to make both of these experts available for deposition by telephone or in person, the parties have stipulated and the Court has ordered that defendant may, by motion, test the sufficiency of plaintiffs' written expert opinions.[2]

Defendant has moved for summary judgment on the bases that plaintiffs are proposing that a physician should be

---

1. This action was initially filed against Alfred I. duPont Hospital for Children. The caption was subsequently amended by stipulation on October 24, 2001 to make the Nemours Foundation, the entity that owns and operates the hospital, the sole defendant.

2. Copies of the expert opinions have been provided to the court by both sides and are found at D.I. 47, Ex. 1, 3 and D.I. 51, Ex. D, F. Regarding the parties' stipulation, see D.I. 47, Ex. 10.

judged by a new standard of care, international recommendations, and that the opinions forming the basis of plaintiffs' case "(1) do not satisfy the minimum requirements of the Delaware medical [malpractice] statute, (2) fail to articulate a standard of care against which any Delaware doctor ought to in fairness be judged, and (3) are based on medical literature that, in part, undermines the very conclusions drawn by the reports." D.I. 47 at 2. Plaintiffs oppose defendant's motion arguing that geography is irrelevant under the Delaware Health Care Malpractice Insurance and Litigation Act (the "Act") since the expert's familiarity with the field of medicine at issue is the only controlling consideration in determining competency of that expert to testify. Further, because both experts designated by plaintiffs practice in the same or similar field as defendant, they are qualified to provide expert testimony. Plaintiffs contend that summary judgment at this stage is premature because plaintiffs' experts "have not had the opportunity to fully explain the opinions they summarized in writing and the grounds for those opinions." D.I. 51 at 2. As a result, plaintiffs request that defendant's motion be denied, or deferred until after plaintiffs' experts have been deposed. *Id.*

## Pertinent Facts

Ester Bonesmo was born in Norway on April 1, 1997 with a functional single heart ventricle, a condition known as hypoplasia left heart syndrome ("HLHS"), which is fatal if left untreated. This condition required the minor plaintiff to undergo three surgeries to correct the defect. She underwent her first surgery in Switzerland shortly after her birth. While in Switzerland, she was under the care of Dr. William Norwood, a pediatric cardiothoracic surgeon, and Dr. John Murphy, a pediatric cardiologist. When Ester returned to Switzerland in September 1997 for a second surgical procedure, she was again un-

der the care of Drs. Norwood and Murphy. D.I. 47 at 3; D.I. 51 at 3.

Shortly after Ester's second surgery, both physicians left Switzerland and founded the Nemours Cardiac Center ("NCC") at the A.I. duPont Hospital for Children in Wilmington, Delaware. NCC is a multi-specialty cardiac treatment center staffed by cardiologists, cardiac anesthesiologists and cardiac surgeons. In April 1998, Ester underwent her third and final surgery, known as the Fontan procedure at NCC. *Id.*

The various surgeries Ester underwent apparently succeeded in establishing proper blood circulation because the child returned to Norway and did well. However, she subsequently developed a protein losing enteropathy and returned to NCC in May 1999 for treatment when her doctors in Norway could not improve her condition. Prior to her return to Wilmington, Ester's pediatric cardiologist in Norway, Dr. Okland, one of plaintiffs' experts, consulted with Dr. Murphy and referred her to NCC for management of her illness.

Ester arrived at NCC on May 20, 1999. On May 27, 1999, a central venous catheter ("CVC") was inserted into her right subclavian vein to administer various medications. Apparently, no anticoagulant medications were administered to her when the CVC was inserted or shortly thereafter.

According to plaintiffs, after the CVC was inserted, Ester's condition deteriorated. She developed a thrombus (clot) in the vena cava which spread to her right pulmonary artery and occluded the flow of blood to her brain. She eventually suffered loss of neurological function and was removed from life support on June 12, 1999 and expired.

After Ester's death, her parents discussed her treatment at NCC with Dr.

Okland. Dr. Okland raised concerns about the care Ester received at NCC. As a result, the plaintiffs contacted the Norwegian Health Ministry, the government department that had arranged for Ester's care in the United States, and the Ministry subsequently retained Dr. Olsson, a pediatric cardiologist in Sweden, to review the child's medical records and render an opinion. On April 19, 2001, Dr. Olsson issued a report, authored in Swedish, in which she criticizes the NCC physicians for not administering continuous anticoagulation therapy and for failing to timely recognize and treat signs and symptoms of a developing thrombus. A translated copy of Dr. Olsson's report was provided to defendant during discovery. In October 2002, plaintiffs advised that they intended to also rely on Dr. Okland as an additional standard of care expert. No report has been provided, but his opinion was summarized by plaintiffs' counsel in a letter to defense counsel dated October 28, 2002, stating that Dr. Okland would "echo the opinions set forth by Dr. Olsson in her April 19, 2001 report." D.I. 47, Ex. 3; D.I. 51, Ex. E. Shortly thereafter, plaintiffs supplied the medical literature relied upon by Dr. Olsson in her report and both experts' *curriculum vitae.*[3]

## Discussion

### Summary Judgment

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate when after discovery, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" demonstrate that there is no genuine issue as to any material fact and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celo-*

*tex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.,* 853 F.2d 1557, 1561 (Fed.Cir.1988) (where there is no genuine issue of material fact, the moving party is entitled to judgment as a matter of law). The moving party, in this case, defendant, bears the initial burden of demonstrating the absence of material issues of fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. When deciding a motion for summary judgment, the court views the facts, and all permissible inferences therefrom, in the light most favorable to the non-moving party, here, plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Under Delaware law, when a party alleges medical negligence, that party must produce expert medical testimony that details: "(1) the applicable standard of care, (2) the alleged deviation from that standard, and (3) the causal link between the deviation and the alleged injury." *Green v. Weiner,* 766 A.2d 492, 494–95 (Del.2001). Defendant argues that, at a minimum, plaintiffs' experts fail to articulate the first two of those three elements.

Pursuant to the Delaware Health Care Malpractice Insurance and Litigation Act (the "Act"), the elements of a medical negligence action in Delaware are defined under 18 *Del. C.* § 6801(7):

> "Medical negligence" means any tort or breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient. The standard of skill and care required of every health care provider in rendering

---

**3.** As of the date of the filing of its opening brief, defendant had not received a copy of Dr. Olsson's reference 8, Universitetssjukhuset I Lund, Barnithiva, PM–Tromboemboliprofylax efter enkammarkirurgi 2000–02–18.

Its title indicates that this is literature published outside the United States and a year after the care in this case was delivered. The other literature relied upon by Dr. Olsson has been provided to the court.

professional services of health care *shall be* that degree of skill and care *ordinarily employed in the same or similar field of medicine as defendant* and the *use of reasonable care and diligence.*

18 *Del. C.* § 6801(7) (emphasis added).

18 *Del. C.* §§ 6853 and 6854 of the Act provide the touchstone required of expert witnesses and the prerequisite for a plaintiff to offer expert testimony showing a deviation from the standard of care:

> No liability shall be based upon asserted negligence unless expert medical testimony is presented *as to the alleged deviation from the applicable standards of care* in the specific circumstances of the case and as to the causation of the alleged personal injury or death . . . .
>
> \*     \*     \*     \*     \*     \*
>
> No person shall be competent to give expert medical testimony as to the *applicable standards* of skill and care *unless* such person *is familiar* with the degree of skill *ordinarily employed* in the field of medicine on which he or she will testify.

18 *Del. C.* §§ 6853, 6854 (emphasis added).[4]

■ Amendments to §§ 6801 and 6854, in 1998 and 1996 respectively, are in derogation of the common law, requiring them to be construed strictly against the party for whose benefit the statutory changes were passed. *Stratford Apartments, Inc. v. Fleming,* 305 A.2d 624, 626 (Del.1973); *Tyler v. Dworkin,* 747 A.2d 111, 125 (Del.Super.1999); *Norfleet v. Mid–Atlantic Realty Co., Inc.,* 2001 WL 695547 at \*8 n. 11 (Del.Super. April 20, 2001). Under *Tyler* and *Norfleet,* the benefit from the amendments was to plaintiffs. *Id.*

■ In addition, the court is cognizant of its gatekeeping function under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Pursuant to these cases and their progeny, the trial court is charged with the responsibility of acting as a gatekeeper to exclude unreliable expert testimony. The recent amendment to Federal Rule of Evidence 703 reaffirms the court's gatekeeping role to assess the reliability and *helpfulness* of proffered expert testimony. This responsibility includes application of the relevant provisions of the Act in determining the competency of an expert to testify. Thus, the *Daubert* obligations and the requirements under the Act co-exist within a determination of whether a witness is competent to give expert medical testimony regarding the applicable standard of skill and care. Federal Rule of Civil Procedure 26(a)(2) is also implicated in light of the parties' arguments.

---

4. In 1996, § 6854 was amended to remove the "locality" requirement needed for an expert to be competent to testify about the standard of care. In *McKenzie v. Blasetto,* 686 A.2d 160 (Del.1996), the Delaware Supreme Court acknowledged that the 1996 amendment to § 6854 eased the qualification requirements for experts. However, any expert testifying regarding national standards of care still had to relate that standard to those applied in the same community or locality in light of § 6801(7). This could be accomplished by the expert, himself, evidencing familiarity with the community or locality or by a "bridging expert" showing that a nation-wide standard of care " 'encompasses both the proffered expert's community and the relevant Delaware community.' " *McKenzie* at 163 (citing *Baldwin v. Benge,* 606 A.2d 64, 68 (Del.1992)). Approximately two years thereafter, the definition of medical negligence was modified. In July 1998, § 6801(7) was amended to label medical malpractice as medical negligence. Further, the definition of medical negligence was changed to be that "degree of skill and care ordinarily employed in the same or similar field of medicine as the defendant," mirroring to a large degree the changes made in § 6854 regarding expert witness' qualifications.

■ Although defendant has moved on the basis that plaintiffs' experts are not qualified to testify under the Act, the burden of showing competency rests on the party proffering the witness or evidence. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548 (Rule 56(c) does not shift the burden to the moving party to produce evidence showing the absence of a genuine issue of material fact, even regarding an issue on which the nonmoving party bears the burden of proof). Thus, this burden does not shift merely because the non-offering party has moved. Although neither the moving nor nonmoving party is required to file affidavits or produce evidence that would be admissible at trial, under Rule 56(e), opposition to a motion for summary judgment must be by the evidentiary materials contained in Rule 56(c) (that is, depositions, answers to interrogatories, admissions on file), and must designate the specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548 (Summary judgment is appropriate where the nonmoving party fails to make a sufficient showing establishing the existence of an essential element of that party's case, and on which the party bears the burden of proof at trial). Therefore, plaintiffs are required in opposition to defendant's motion to provide evidence of their experts' competency.

Plaintiffs argue that defendant's motion for summary judgment should be denied because the Act does not enjoin a plaintiff from using a foreign medical expert to testify regarding the applicable standard of care. Rather, the Act is merely directed to an expert's familiarity in the same or similar field of medicine. As a result, geography is irrelevant. Further, since Drs. Olsson and Okland[5] practice in the same or related field of medicine as defendant, under the Act they are qualified to testify. Moreover, according to plaintiffs, defendant's motion is premature because their "experts have *not had the opportunity to fully explain*" their opinions, including the bases or grounds for them, in their written summaries. D.I. 51 at 2, 9. (emphasis added). Therefore, plaintiffs contend that defendant's motion should be denied, or at least, a decision on the motion deferred until after plaintiffs' experts have been deposed.[6]

### Standard of Care

The primary focus of defendant's argument is that plaintiffs' experts are not qualified to provide expert testimony under the Act since both experts rely on international recommendations. Since the Act has been interpreted as requiring Delaware doctors to meet a national standard of care, plaintiffs' experts are not qualified or competent to testify. Further, contends defendant, since neither expert, according to their *curriculum vitae*, has had any professional connection to the United States, they are not qualified to present bridging testimony. Therefore, in the absence of any evidence of the standard of care in the United States for the treatment of children with a CVC, defendant argues that plaintiffs' reliance on some vague international recommendations is misplaced. Moreover, according to defendant, the literature relied upon by Dr. Olsson does not support her conclusions.[7]

5. A pediatric anesthesiologist/surgeon and pediatric cardiologist, respectively, as according to their *curriculum vitae*. See, D.I. 51, Ex. G, H.

6. The parties agree that plaintiffs' counsel has offered for their experts to be deposed either by telephone or in person in Norway and Sweden.

7. In light of the limited information provided regarding Dr. Okland's opinion, it is not clear that he relies upon or, for that matter, has read the literature provided by Dr. Olsson. However, the court in its analysis will, for the

Relying on 18 *Del. C.* §§ 6801(7) and 6854, plaintiffs counter that Delaware law does not preclude foreign experts from testifying as to the standard of care and deviation therefrom. Under these sections, the only pertinent inquiry is the proffered expert's familiarity with the field of medicine on which he or she will testify. Further, according to plaintiffs, defendant's criticism of Dr. Olsson's use of the words "international recommendations,"[8] rather than "standard of care" is hypertechnical and contrary to Delaware case law.

Based on review of the applicable statutes and case law, the court agrees that neither automatically forecloses the use of foreign doctors from testifying regarding the standard of care. Furthermore, according to *Green v. Weiner*, 766 A.2d 492, 495 (Del.2001), § 6853 "does not require medical experts to couch their opinions in legal terms or to articulate the standard of care with a high degree of *legal precision* or with 'magic' words." (emphasis added). Therefore, this court finds that international recommendation is interchangeable with international standard.[9]

Contrary to plaintiffs' argument, the inquiry into an expert's competency is not limited to the field of medicine on which the expert will testify. Rather, for an expert to be qualified to testify regarding the applicable standards of skill and care, he or she must be familiar with that degree of skill "ordinarily employed" within the field of medicine. Moreover, the definition of medical negligence provides that the standard required of a health care provider is that "ordinarily employed" in the same or similar field of medicine as defendant. Here, plaintiffs' experts assert that the skill and care ordinarily employed in their field of medicine and that of defendant is an international standard. However, beyond Dr. Olsson's report and the literature upon which she relies, there is nothing more before this court regarding plaintiffs' experts' familiarity with the degree of skill *ordinarily employed.*

Nevertheless, in light of the analysis that follows, the court need not decide whether the amendments to the Act eliminating the locality requirement resulted in an international standard of care against which Delaware health care providers would be judged. Plaintiffs have failed to show that there is an international standard of care ordinarily employed in the treatment of children with CVCs.

As evidenced by the conclusion in her expert report, Dr. Olsson's criticism of the care provided by defendant focuses both on the use of prophylactic treatment with a CVC and the diagnosis and treatment of CVC-related deep vein thrombosis at an earlier stage. As a result, the court must examine the literature to determine whether in the prevention, diagnosis and treatment of thrombi in children with a CVC, there is an international standard of care that is ordinarily employed.

Dr. Olsson cites three articles in support of her opinion that in treating children with a CVC, prophylactic continuous infusion of Heparin (either 1 IE Heparin per ml. or 2 ml. per hour) is required: Chua *et al., Use of Central Venous Lines in Pediatrics—A Local Experience,* 3 Ann. Acad. Med. Singapore 358–62 (1998); Petaja *et al., Venous Thrombosis in Pediatric Cardiac Surgery,* 7 Journal of Cardiothoracic and Vascular Anesthesia 889 (1997); and, a

present purposes, operate from those assumptions.

8. Plaintiffs note that Dr. Olsson's report was translated from Swedish, and as a result, use

of the term "recommendation" rather than "standard" should not be fatal.

9. This court did not view defendant basing its arguments on mere technical criticisms.

Swedish publication, 8 Universitetssjukhuset I Lund, Barnithiva, PM–Tromboemboli–profylax efter Enkammarkirurgi 2000–02–18. D.I. 47, Ex. 8, 9.

The Chua reference involves the study of 57 central venous catherizations performed on forty pediatric patients between August 1994 and August 1995 at a hospital in Singapore. This article focuses on the problem with infection associated with those catherizations. *Id.* at 360. Although heparinization is now practiced at that facility when the infusion rate is below a certain level, the article does not recommend or discuss the use of continuous Heparin or other anticoagulants to prevent thrombosis with CVC use, nor the diagnosis or treatment employed in children when a thrombosis occurs. D.I. 47, Ex. 8. It does not suggest any standard.

The Petaja article observes that the literature concerning venous thromboembolism in pediatric cardiac surgery is sparse, although venous thrombi occurring late after a Fontan operation are a recognized complication. D.I. 47, Ex. 9 at 890. The article also comments that central vein thrombosis in children is often asymptomatic. When central venous thrombosis occurs, thrombolytic therapy is favored. However, the article also notes that prospective studies concerning the efficacy and safety of anticoagulant and thrombolytic medications and the comparative studies between them are lacking in pediatrics. *Id.* at 891. Therefore, regarding the use of thrombolytic therapy in children, the article observes

Accordingly, recent *international consensus recommendations* on the pediatric use of antithrombotic treatment do not provide conclusive guidelines about thrombolysis. Urokinanse,[10] streptokinase and t-PA have all been used in pediatric patients with variable doses, duration of therapy and clinical success. . . .

Without controlled data, case specific judgment, reliance on the gained personal experience with the chosen protocol, and continuous critical evaluation of the results remain central in pediatric thrombolysis.

*Id.* at 892 (emphasis added).

As noted previously, neither this court nor defendant has a copy of the third article.

Two other articles cited by Dr. Olsson also evidence a lack of a discernable international standard of care. These articles reveal that children with deep vein thrombosis had received a variety of therapeutic interventions and medications with the initiation, dose and duration varying greatly. Rather than supporting plaintiffs' experts position, these articles are reflective of the lack of studies to determine optimal treatment. The relative risks and benefits of the various therapies are unknown and the appropriate timing, administration, type and duration of anticoagulation treatment is also unknown. Both articles recommend further studies to devise effective prophylactic and therapeutic regimens in the prevention and treatment of CVC-related deep vein thrombosis in children.[11]

---

10. Urokinase was administered by defendant, as noted by Dr. Olsson, on June 2, when she claims that deep vein thrombosis should have been suspected.

11. Massicotte, *et al. Central Venous Catheter Related Thrombosis in Children: Analysis of the Canadian Registry of Venous Thromboembolic Complications,* J Pediatric 1998, 6:770–776; Monagle, *et al., Outcome of Pediatric*

*Thromboembolic Disease: A Report from the Canadian Childhood Thrombophilia Registry,* Pediatric Res.2000, 6: 763–766. Both studies involve extensive evaluation of thromboembolic complications in children. The Massicotte article concerns data collected from monitoring 244 children from July 1, 1990 to December 31, 1996. The Monagle report involves monitoring 405 children entered in the Registry from May 1990 to December 1996.

D.I. 47, Ex. 5,6.

The review of the medical papers relied upon by plaintiffs' experts do not support their position that there exists a degree of skill ordinarily employed in the prevention, diagnosis and treatment of thrombosis relating to the use of CVCs in children. Rather, this literature shows that various approaches have been and are used, and, as a result, fails to demonstrate any required, or uniform, or widely accepted treatment or care, national or international, in this area.

In addition, the literature cited by Dr. Olsson does not support her suggestion that, internationally, prophylactic antithrombotic treatment, via Heparin infusion or some other anticoagulant medication, such as Warfarin,[12] is ordinarily administered in children treated with a CVC or after modifications of Fontan surgery. Since Dr. Okland's opinion has been represented to be similar to that of Dr. Olsson's, his opinion is likewise unsupported from the literature provided.

Moreover, Dr. Olsson's comments regarding what is done at the hospital in Lund, Sweden, and in accordance to the guidelines of that facility,[13] are directed to that institution and to that area and do not suggest such practices are the standard of care elsewhere.[14]

Dr. Olsson opines that deep vein thrombosis caused Ester's death. However, although she states that the risk of deep vein thrombosis should have been decreased by the treatment she proposed, she is uncertain as to the degree. Moreover, she also notes that once deep vein thrombosis develops, the mortality rate among children is high. What is left to question is whether based on reasonable medical probabilities, the introduction of the treatment she recommends would have prevented the development of deep vein thrombosis, and, more importantly, once deep vein thrombosis developed, whether

---

The Massicotte article specifically concludes: "Currently no uniform guidelines exist for the prevention and management of CVL [central venous line]—related to DVTs [deep venous thrombosis] in children." According to the Monagle article, "(f)urther studies are required to identify specific risk factors for these complications and to devise effective prophylactic and therapeutic strategies" for children with CVL-related DVT/PE [deep venous thrombosis/pulmonary embolism] and recommends multicenter international clinical trials to accomplish these goals.

12. The dosage and frequency of administration were not provided in Dr. Olsson's report.

13. These comments relate to the use of Warfarin, the generic name or chemical form of the drug Coumadin, an anticoagulant (see Physician's Desk Reference Vol. 49 at 949) and to evaluating coagulation status. Moreover, the Petaja article regarding AT III levels comments: "AT III levels are followed daily in neonates after cardiac surgery and AT III concentrate is administered when necessary to maintain normal levels of AT III. However,

this practice cannot be taken as a general recommendation because solid proof of the antithrombotic efficacy of AT III in this setting is still lacking, even though there is some circumstantial evidence of benefit." Petaja, et. al., Venous Thrombosis in Pediatric cardiac Surgery at 891. (emphasis added).

14. Plaintiffs find it significant that Drs. Norwood and Murphy, two of defendant's physicians most intimately involved with Ester's care, practiced in Switzerland, arguing that neither would contend that they treated the child differently in the United States than they did in Switzerland. Those comments are not relevant since there is no evidence before the court regarding or comparing the care administered by them in Switzerland and the United States, or that their care involved the same or similar pediatric medical treatment and issues involved in this case.

Moreover, as Dr. Murphy commented in his deposition, there was no well accepted treatment for Ester's protein loss problem, the medical condition for which she was referred to defendant. D.I. 51, Ex. B at 13.

Ester's death would have been prevented. As a result, there is a serious question whether Dr. Olsson's opinion adequately addresses proximate cause, the third element required under *Green v. Weiner*, 766 A.2d 492 (Del.2001), to show medical negligence.

## Rule 26(a)(2)(B)

■ Plaintiffs contend that defendant's motion is premature since neither of their experts have had the opportunity to fully explain their opinions nor the grounds for them. This can be easily cured, according to plaintiffs, by defendant deposing their experts via depositions, either by telephone or live in Norway and Sweden. Deposing their experts are critical for a complete understanding of their opinions. Moreover, the bases of their opinions are not founded on just the medical literature, but on a number of other considerations.[15]

Plaintiffs' arguments assume that the burden rests on defendant to seek out the necessary information regarding competency, rather than plaintiffs having the affirmative obligation to demonstrate the qualifications of *their own* experts. Such rationale ignores the requirements of Rule 56, the obligations of a party proffering an expert under Rule 26(a)(2)(B) and the provisions of the Act.

Rule 26(a)(2)(B) requires a written report of a testifying expert to contain a *detailed* and *complete* statement of all opinions on which the expert will testify, and the *bases* and *reasons* for those opinions. Further, the rule requires the report to be signed by the expert witness. As evidenced by the changes to Rule 26, effective almost ten years ago, their purpose was to greatly reduce, or possibly eliminate, the need for depositions of experts.

The only information provided to this court regarding the testimony and qualifications of Dr. Okland is through a letter from Ms. Neilli Walsh, plaintiffs' counsel, dated October 28, 2002 regarding Dr. Okland's opinion and his *curriculum vita*. D.I. 51, Ex. F, H. According to this letter, Dr. Okland will provide testimony both in his capacity as a treating physician and as an expert witness. Regarding his testimony as an expert, he apparently will

> [E]cho the opinions set forth by Dr. Olsson in her April 19, 2001 report; *specifically,* that defendant violated the standard of care by failing to appreciate that Ester was at increased risk for developing deep vein thrombosis and failing to institute appropriate measures to prevent the development of a thrombis (sic) including placing her on anti-coagulant therapy once the central venous catheter was inserted. Dr. Okland will further testify that defendant was negligent in failing to timely recognize signs and symptoms of a developing clot and in failing to timely treat the thrombis (sic). Finally, it is Dr. Okland's opinion that Ester's death could have been prevented had defendant adhered to the standard of care. (emphasis added).

Although Dr. Okland will "echo the opinions" of Dr. Olsson, the specifics provided regarding his opinion are at best minimal and conclusory.[16] Although he opines that defendant failed to appreciate that Ester was at an increased risk for developing DVT, there is no description of any facts

---

15. This argument appears to refute paragraph 2 of the parties' stipulation wherein it is represented that the report of Dr. Olsson contains "a complete statement of all of plaintiffs' expert opinions and the basis and reasons therefor...." D.I. 45.

16. According to the parties' stipulation, Drs. Olsson and Okland "are designated as plaintiffs' experts, and they are expected to testify in accordance with Dr. Olsson's report and the summary of Dr. Okland's testimony provided ... by letter date October 28, 2002."

or information on which he relies as evidencing this failure.[17] Dr. Okland also criticizes defendant for failing to institute appropriate *measures* to prevent the development of a thrombus, which include placing Ester on anti-coagulant therapy. Assuming that Dr. Okland agrees with Dr. Olsson's report regarding the use, timing of administration, and dosage of Heparin, the comments regarding his testimony fail to describe what those other measures are. In light of plaintiffs' other conclusory statements regarding Dr. Okland's opinion, the court can only assume that Dr. Okland's testimony will be exactly the same as Dr. Olsson's comments regarding defendant's care and nothing more on this issue.[18]

Although an expert is not expected to articulate the standard of care with legal precision,[19] Rules 26(a)(2)(B) and 56 require the designation of specific facts showing a genuine issue, through a detailed statement of the expert's opinions and the bases and reasons for the opinions. Contrary to plaintiffs' argument, the opposing party is not required to depose the expert to develop what his opinion is or the reasons for it.

**Conclusion**

Therefore, as demonstrated above, plaintiffs have failed to establish that an international standard of care exists that is ordinarily employed in the treatment of children with CVCs.

Moreover, consistent with the representations in the parties' stipulation and the requirements of Rule 26, Dr. Olsson's report is the complete opinion of both experts containing the bases and reasons in support of the opinion. Since the court has been provided with a full explanation of plaintiffs' experts' position, defendant's motion for summary judgment is not premature. Accordingly, defendant's motion for summary judgment is granted.

All of the case law identified by the parties addresses the application of §§ 6801(7) and 6854 before these statutes were amended. It is clear from those cases that the historical debate involved application of local standards versus national ones. Except for a footnote in *Norfleet v. Mid–Atlantic Realty,* a case which determined that the applicable standards for professionals, other than physicians, is dictated by local standards of care, no other Delaware case has directly commented on the effect of the changes in both §§ 6801(7) and 6854.[20] However, this court doubts that the Delaware Supreme Court would embrace the logic propounded by plaintiffs regarding an international standard of care.

---

**17.** It is not clear that Dr. Olsson maintains this opinion since her report notes that general antithrombotic treatment after Fontan surgery was discussed during defendant's treatment of Ester.

**18.** This conclusion is consistent with paragraph 2 of the parties' stipulation. D.I. 45.

**19.** *See, Green v. Weiner, supra.*

**20.** *Norfleet* dealt with the common law standard of care for landlords and noted in footnote 11 relying on *Baldwin v. Benge,* 606 A.2d 64 (Del.1992) the need for bridging testimony. The court also commented that the Delaware legislature had changed the standard of care in medical negligence cases to a nationwide standard, which is in derogation of the common law.

*Tyler v. Dworkin,* 747 A.2d 111, 125 (Del. 1999), a case relied upon by defendant, was directed to the application of former § 6801(7) with amended § 6854. It held that § 6801(7), unlike § 6854, could not be applied retroactively and found no ambiguity in applying amended § 6854 (a procedural statute) with former § 6801(7) (a substantive statute). It also determined that the changes made to both statutes were in derogation of the common law and therefore, "must be construed strictly against the party for whose benefit it was passed. Plaintiff patients are the beneficiaries of this change."

As commented previously and as evidenced from the cases cited in the parties' briefs, historically the debate has been the relationship and equivalency between local standards and national standards. *See also Taylor v. Wilmington Medical Center, Inc.,* 577 F.Supp. 309 (D.Del.1983); *Medical Center of Delaware v. Lougheed,* 661 A.2d 1055 (Del.1995); *Loftus v. Hayden,* 391 A.2d 749 (Del.1978). The focus of these cases often centered on the national certification process in medical specialties. In fact, the plaintiffs' bar actively argued that this certification process established the existence of a national standard of care. The debate did not include discussion of international standards or international certifications.

Further, the Joint Commission on Accreditation of Healthcare Organizations evaluates and accredits nearly 17,000 health care organizations and hospitals in the United States. It is a nationally recognized accreditation body governed by a Board of Commissioners, which includes the American College of Physicians–American Internal Medicine, the American College of Surgeons, the American Hospital Association, the American Medical Association and other national certification organizations. It is a national body evaluating health care organizations and whether they meet certain performance standards within the United States. *See* www.jcaho.org.

Finally, the National Practitioner Data Bank (NPBD), found under 42 U.S.C. Chapter 117 (1986), was enacted to address the increasing occurrence of medical malpractice litigation and the need to improve the quality of medical care in the United States. The intent of this legislation was to improve the quality of health care by encouraging individual state licensing boards, hospitals and other health care entities and professional societies to identify and discipline those who engage in unprofessional behavior and to restrict the ability of incompetent physicians and other health care practitioners from moving state to state without disclosure or discovery of previous medical malpractice payment and adverse action history. The NPBD is primarily an alert system to facilitate a comprehensive review of the professional credentials of those health care providers practicing in the United States.

The cases discussing standard of care, the certification process for health care practitioners and for healthcare organizations and the federal approach to the improvement of health care through a nationwide reporting system point to a national, rather than an international standard.